In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-2329

NATIONAL LABOR RELATIONS BOARD,

*Petitioner,*

*v.*

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL
UNION 16, AFL-CIO,

*Respondent.*

Application for Enforcement From
National Labor Relations Board.
No. 25-CB-8630

ARGUED SEPTEMBER 8, 2005—DECIDED OCTOBER 12, 2005

Before FLAUM, *Chief Judge*, and EASTERBROOK and
ROVNER, *Circuit Judges*.

FLAUM, *Chief Judge*. Petitioner National Labor Relations
Board ("NLRB" or "Board") petitions this Court for enforce-
ment of its order declaring that the International Brother-
hood of Electrical Workers, Local Union 16, AFL-CIO ("the
Union" or "IBEW") committed an unfair labor practice
under § 8(b)(1)(A) of the National Labor Relations Act, 29
U.S.C. § 158(b)(1)(A) ("NLRA" or "Act"). Because the board's
decision is supported by substantial evidence and has a
reasonable basis in law, we enter judgment enforcing the
Board's order.

## I. Background

The Union is a party to two collective bargaining agreements ("CBAs") that are relevant to this case. The first relevant CBA is between the Union and the Evansville Division of the National Electrical Contractors Association ("NECA"). The NECA Agreement covers nearly all work performed by the Union's members in southwestern Indiana and one county in Illinois. Signatories to that document agree to hire electrical workers exclusively through the Union's referral or "hiring hall" system. That system requires the Union to maintain a list of eligible electricians, categorized by experience and skill level, who are available to work. Signatory employers to the CBA agree to advise the Union when they require electricians. The Union then refers members from its list; those who have been out of work the longest are dispatched first.

The NECA Agreement also contains the following union security clause:[1]

> All Employees in the bargaining unit who are members of the Union in good standing on the effective date of this Agreement as a condition of employment must maintain their membership in good standing for the life of this Agreement.
>
> Any Employee who is not a member of the Union, and any Employee who is hired after the effective date of this Agreement or the date of its execution, shall be required to join the Union eight (8) days following the effective date of this Agreement or the date of its execution or following the date of his employment

---

[1] A "union security clause" is a clause in a CBA that requires all employees to be members of the union and to have paid applicable dues and fees. *NLRB v. Arthur Sarnow Candy Co.*, 40 F.3d 552, 554 n.2 (2d Cir. 1994).

> whichever is the latter and may be required as a condition of his employment maintain [sic] his membership in good standing for the life of this Agreement.

The second CBA relevant to this case is an agreement between the Union and Koester Contracting Corporation ("Koester"). The Toyota Corporation awarded Koester a substantial contract to construct a truck manufacturing plant in Gibson County, Indiana. A collective bargaining agreement between the Union and Koester governs the work that the Union does for Koester and other contractors in constructing the plant ("Toyota Agreement"). The Toyota Agreement states that it "represents the complete understanding of the parties." It also provides that "the terms and conditions of this Project Agreement shall supersede and override terms and conditions of any and all other national, area, or local collective bargaining agreements." Like the NECA Agreement, the Toyota Agreement contemplates that signatories will hire employees through a union referral system. It states, moreover, that contractors performing work at the Toyota plant "agree to recognize and be bound by the legal referral facilities maintained by the union(s) and shall notify the appropriate union either in writing or by telephone when workmen are required." The Toyota Agreement does not, however, contain a union security clause nor mention the NECA Agreement.

Darvin Collins was a member of the Union. In August of 2002, a project that he was working on ended. Out of work, he registered on the Union's referral list. On August 19, 2002, ACCL Enterprises, a construction contractor working under Koester's Toyota Agreement, contacted the Union and requested that it refer an available electrician for work on the Toyota project. Collins was qualified for the position and next in line for referral; however, he owed the Union $64.70 in back dues. The Union informed him that it would not refer him for the Toyota project until he paid the

back dues. Collins refused to pay. The Union's assistant business manager informed Collins that the Union would not refer him for the Toyota project until he fully satisfied his dues obligation.

In response to the Union's action, the General Counsel for the National Labor Relations Board issued a complaint against the Union, alleging that the Union's refusal to refer Collins was an unfair labor practice. On September 4, 2003, Administrative Law Judge Ira Sandron ruled in favor of the Board, concluding that the governing CBA did not contain a union security clause and, therefore, the Union could not refuse to refer Collins. Additionally, the ALJ found that the Toyota Agreement did not incorporate the NECA Agreement's union security clause. The ALJ held that the Union's actions violated 29 U.S.C. § 158(b)(1)(A) and ordered the Union to pay Collins two days of missed wages. The Board affirmed the ALJ's order with minor revisions. The Board now petitions this Court for enforcement of the order and the Union has responded with an answer and objections.

## II. Discussion

In this case, the Board seeks to enforce its ruling that the Union has committed an unfair labor practice in violation of 29 U.S.C. § 158 (b)(1)(A). An agency that seeks enforcement of its decision must file the record with the circuit court clerk "within 40 days after it files an application for enforcement." FED. R. APP. P. 17(a). In this case, the Board did not file the administrative record until 74 days after the application for enforcement was filed.[2] Lawyers appearing

---

[2] The application for enforcement was filed on May 24, 2004. The
(continued...)

before this Court are responsible for knowing and following all applicable procedural rules.[3]

In this case, however, the Court will excuse the late filing by the Board. There has been no demonstration of prejudice to the Union as a result of the delay. Moreover, other than the time limits on filing an appeal, "a court of appeals may—to expedite its decision or for other good cause—suspend any provision of [the Federal Rules of Appellate Procedure] in a particular case." FED R. APP. P. 2; *see also* FED R. APP. P. 26(b). The infraction in this case was harmless and dismissal would be an inappropriate sanction. *Cf. Fisher v. Krajewski*, 873 F.2d 1057, 1061 (7th Cir. 1989) (dismissal may be avoided despite failure to file a transcript if the transcript is subsequently filed and the court can engage in meaningful review).

This Court has jurisdiction to review applications for enforcement and petitions for review of Board decisions pursuant to sections 10(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 160(e)-(f). This Court will uphold decisions by the Board if they are supported by substantial evidence and the Board's conclusions have a reasonable basis in the law. *See*, *e.g.*, *Ryder Truck Rental v. NLRB*, 401 F.3d 815, 825 (7th Cir. 2005). There are no questions of fact in this case, no witnesses were presented and the parties stipulated to all relevant facts. Instead, this case turns on the NLRB's interpretation of two collective bargaining agreements. The Board has no special expertise in inter-

---

[2] (...continued)
administrative record was filed on August 6, 2004.

[3] The Board's alleges that it contacted the Clerk's Office by telephone on July 7, 2004 and was following directions from the clerk's office, but fails to note that no contact was made between the Board and the clerk's office until after the 40-day period for filing had expired.

preting contracts. Accordingly, this Court reviews the Board's interpretations of collective bargaining agreements de novo. *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 202-03 (1991); *NLRB v. Cook County School Bus, Inc.*, 283 F.3d 888, 892 (7th Cir. 2002); *Chicago Tribune Co. v. NLRB*, 974 F.2d 933, 937 (7th Cir. 1992).

Section 9(a) of the NLRA grants unions the exclusive power to represent all employees in a particular bargaining unit. 29 U.S.C. § 159(a). The Supreme Court has held that the grant of this power imposes a concomitant duty upon the union to represent all members of the collective bargaining unit fairly. *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 86-87 (1989). The implied duty of fair representation obligates the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967) (citing *Humphrey v. Moore*, 375 U.S. 335, 342 (1964)).

Section 8(b)(1)(A) of the NLRA declares that "[i]t shall be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(b)(1)(A). Section 157 of Title 29 guarantees employees "the right . . . to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. The NLRB has read § 157's right of representation to include "the right to be free from unfair or irrelevant or invidious treatment by their exclusive bargaining agent in matters affecting their employment." *Miranda Fuel Co.*, 140 N.L.R.B. 181, 185 (1962). In other words, although the duty of fair representation arises out of § 159(a), the breach of that duty "restrain[s] or coerce[s]" an employee's rights under § 157, thereby constituting an unfair labor practice under § 158(b)(1)(A). *Miranda Fuel Co.*, 140 N.L.R.B. at 185-86. The

Seventh Circuit generally has approved of this doctrine. *See Kesner v. NLRB*, 532 F.2d 1169 (7th Cir. 1976).

The duty of fair representation extends to a union's administration of an exclusive hiring hall agreement. *See Lewis v. Local Union No. 100 of Laborers' Int'l Union of N. Am.*, 750 F.2d 1368, 1375-76 (7th Cir. 1984). A union is presumed to have breached its duty of fair representation if, in the administration of a hiring hall agreement, it refuses to refer a member who is eligible under that agreement. *Int'l Union of Operating Engineers Local 406*, 262 N.L.R.B. 50, 57 (1982). A union may rebut this presumption by showing that it was acting pursuant to a valid union security clause in the controlling collective bargaining agreement. *Iron Workers Local 118*, 257 N.L.R.B. 564 (1981) ("A valid union-security clause can be enforced at the hiring hall level by a refusal to refer an employee whose dues are in arrears, so long as the employee has already worked for the statutory grace period in the bargaining unit to which the collective-bargaining agreement containing the union-security clause applies.").

The question therefore becomes whether the controlling collective bargaining agreement contains a union security clause. The parties agree that the Toyota Agreement controls and that it does not contain an explicit union security clause. The Union argues, however, that the NECA Agreement's union security clause is incorporated into the Toyota Agreement by reference.

There is a great deal of evidence to support the Board's finding that the NECA union security clause was not incorporated into the Toyota Agreement. First, the Toyota agreement neither makes explicit mention of a union security clause nor does it make any explicit reference to the NECA Agreement. "When interpreting a contract, we cannot read terms into the language that are not expressly stated[.]" *GNB Battery Tech., Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995).

Second, any claim that the NECA Agreement is implicitly adopted is refuted by the plain language of the Toyota Agreement. The Toyota Agreement contains an integration clause. This clause prohibits the adoption of any additional provisions by implication. *See* RESTATEMENT (FIRST) OF CONTRACTS § 228 (1932). The integration clause specifically states that "the terms and conditions of [the Toyota Agreement] shall supersede and override terms and conditions of any and all other national, area, or local collective bargaining agreements. It is understood that this is a self-contained, stand alone [sic], Agreement." The parties' intent to avoid implicit adoption of any other agreements is also demonstrated by language contained in the preamble of the Toyota Agreement, which states that "[t]his Agreement represents the complete understanding of the parties." Where the parties' express language prohibits additional terms from being read into the contract, there is a presumption that the contract is complete in and of itself. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prod., Inc.*, 212 F.3d 373, 380 (2000); *see also Bozetarnik v. Mahland*, 195 F.3d 77, 83 (2d Cir. 1999) (agreement with an integration clause precludes "incorporation into the contract of implied terms that are inconsistent with the contract").

Third, any references in the Toyota Agreement to "legal referral facilities maintained by the union(s)" does not necessitate an incorporation of previous agreements governing those facilities. While the Toyota agreement does state that the "execution contractors agree to recognize and be bound by the legal referral facilities maintained by the union(s) and shall notify the appropriate union either in writing or by telephone when workmen are required," this clause is not sufficient to incorporate the NECA Agreement's union security clause into the Toyota agreement.

The irreconcilable terms and conditions separating the two collective bargaining agreements extends beyond

their differences as to the existence of a union security clause. For example, although both agreements allow an employer to hire employees outside of the referral system when the Union cannot provide enough workers to fill the employer's request, the agreements treat these workers differently. The NECA Agreement requires that employees hired outside of the referral system work only temporarily. The Toyota Agreement, however, allows the employer to keep such employees indefinitely. The two agreements also differ as to the order of layoffs. The NECA Agreement requires an employer to lay off the least experienced workers first. The Toyota Agreement grants the employer sole discretion to decide the order of layoffs.

Any reasonable reading of the Toyota Agreement reveals that it does not implicitly or explicitly incorporate the NECA Agreement's union security clause or any other union security clause. Thus, the Board was correct to find that the Union cannot defend its refusal to refer Collins on the ground that it was enforcing a union security clause.

A final argument raised by the Union is that it lawfully refused to refer Collins on the ground that it was enforcing a "uniformly applied referral rule designed to maintain the integrity of the hiring hall." Because this argument was raised for the first time in the Union's reply brief, we will not address its merits. An argument raised for the first time in a reply brief is forfeited. *Leber v. Universal Music & Video Distrib., Inc.*, 332 F.3d 452, 453 (7th Cir. 2003); *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1035 n.2 (7th Cir. 2005).

## III. Conclusion

Substantial evidence supports the NLRB's finding that the Union committed an unfair labor practice under the National Labor Relations Act by refusing to refer Collins. Therefore, we ENFORCE the NLRB's order in full.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—10-12-05