# In the
# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 04-3793

NICK SLUSHER,

*Petitioner*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent.*

―――――――――

On Application for Review of an Order of
The National Labor Relations Board.
No. 13-CA-40976

―――――――――

ARGUED JUNE 6, 2005—DECIDED DECEMBER 23, 2005

―――――――――

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*. Exxon Mobil Corporation ("Exxon Mobil" or the "Company") suspended and then terminated union steward Nick Slusher after he gave certain co-workers copies of a court record showing that an Exxon Mobil truck driver previously had been fined, placed under supervision, and ordered to participate in a remedial education program for driving under the influence of alcohol ("DUI"). Exxon Mobil viewed circulation of the record as a violation of the Company's anti-harassment policy; it also concluded that Slusher lied about his conduct in the course of the Company's investigation. Slusher filed a charge with the National Labor Relations Board ("NLRB" or the "Board") contending that his suspension and discharge

amounted to an unfair labor practice. Slusher claimed that he had distributed the driver's court record in connection with a disparate treatment grievance he was pursuing on behalf of another union member. Whereas the driver whose DUI record he showed to others was still driving for the Company, other drivers with prior DUIs on their records had been suspended from driving duties and reassigned. Slusher averred that he distributed the record not to harass the driver in question but rather to demonstrate to union members that Exxon Mobil was not applying the Company's drug and alcohol policy in an evenhanded manner and to explain why the union was pursuing a disparate treatment grievance. Given that purpose, Slusher asserted that his distribution of the record was protected by the National Labor Relations Act ("NLRA" or the "Act") and that Exxon Mobil could not lawfully punish him for it. Following an evidentiary hearing, an Administrative Law Judge ("ALJ") agreed, finding that Slusher's motive in distributing the abstract was legitimate. On review, however, a divided panel of the NLRB found that Slusher's motive was to harass the truck driver whose abstract he distributed and that, consequently, Slusher's conduct was not protected by the Act. Based on that finding, the Board ordered that Slusher's complaint be dismissed. *Exxon Mobil Corp.*, 343 NLRB No. 44, 2004-05 NLRB Dec. (CCH) ¶ 16,808, 2004 WL 2245467 (Sep. 30, 2004). Slusher petitions for review of the Board's decision, contending that it is not supported by substantial evidence. We grant the petition, reverse the Board's order, and direct the reinstatement of the ALJ's decision.

## I.

Exxon Mobil came into being as the result of the November 30, 1999, merger between Exxon and Mobil Corporations. Slusher was employed by Mobil and its successor

Exxon Mobil for a total of about 14 years prior to his discharge in 2003; Slusher was a truck driver who delivered gasoline to Mobil, and later Exxon Mobil stations in the Chicago metropolitan area. Local 705 of the International Brotherhood of Teamsters, AFL-CIO ("Local 705," the "Local," or the "Union") had represented fuel truck drivers and product technicians at the Mobil facilities in (or near) Des Plaines and Lockport, Illinois since 1996, and it continued to represent these employees after the merger: Exxon Mobil executed a new collective bargaining agreement ("CBA") with the Union effective May 17, 2000 through April 30, 2002.

Slusher, who had been elected chief Union steward of the Local in January 1998, continued in that capacity until April 11, 2003. As the chief steward, Slusher was responsible for enforcing the terms of the CBA, a job which included the investigation, filing, and processing of grievances on behalf of Union members. Slusher was known to be an "extremely aggressive" advocate for the Union who enforced the CBA "to a T." Tr. 196. Slusher estimated that he filed at least 15 to 20 grievances in the two years preceding his discharge. Steven Matter, the Union representative for the Lockport and Des Plaines facilities, thought that Slusher had filed more grievances than most other stewards. In Matter's view, Slusher "was very good at what he did." Tr. 197.

In the wake of the merger between the two companies, Exxon Mobil decided to implement Exxon's pre-merger drug and alcohol policy, which barred employees with drug or alcohol dependencies or who had drug or alcohol related incidents in their pasts from performing certain designated safety-sensitive jobs, including driving fuel tanker trucks. Upon implementation of this policy, every employee working in such a position was required to file an initial "Statement of Compliance for Designated Positions" in which the employee disclosed any participation in a drug or alcohol

rehabilitation program and any prior "DUI incident," a term defined (at that time) to include not only convictions but also arrests for alcohol or drug related traffic violations.[1] On a going-forward basis, employees were again required to disclose any and all arrests for drug or alcohol related traffic violations, as well as convictions. According to Exxon Mobil, if an employee disclosed a current DUI charge, the employee would be suspended with pay and then reassigned to a different, non-"designated" position within the Company pending the resolution of that charge. New charges that resulted in a conviction, as well as prior DUI convictions less than five years old, would bar the employee from working as a tanker driver. But, according to the Company, a single conviction or other incident more than five years old would not necessarily bar the employee from that position; rather, Exxon Mobil would exercise its discretion on a case-by-case basis. In the event the Company discovered that an employee had failed to disclose a conviction or other DUI incident that should have been reported, the employee would be terminated.

The Union opposed implementation of this policy because it was more onerous for employees than Mobil's pre-merger policy. Evidently, Mobil had not asked its drivers about prior incidents or previous participation in rehabilitation programs; moreover, a single DUI charge, even if it resulted in a conviction, would not necessarily bar an employee from working as a driver for Mobil so long as he or she had no other history of drug or alcohol abuse, agreed to participate in the Company's rehabilitation program, and did not re-offend. Exxon's policy, by contrast, was described by Matter as a "zero tolerance" policy. Tr. 237. The Union, believing that the new policy amounted to a unilateral change in the terms of employment for drivers, filed an unfair labor

---

[1] The Company's policy was subsequently revised to require the disclosure of prior convictions only.

practices charge challenging the policy. However, the NLRB's regional director declined to issue a complaint.

When the new policy was implemented in 2001, two members of Local 705—Rick Moreno and Dan Wallace—were suspended from driving duties and reassigned based on their disclosure of prior drug or alcohol related matters that the Company considered disqualifying. Wallace later resigned. Slusher filed grievances on behalf of both drivers. However, the Union declined to take them to arbitration and, as a result, both grievances lapsed.

In early August 2002, driver Frank Blommaert disclosed that he recently had been arrested and charged with DUI. Exxon Mobil immediately suspended Blommaert with pay from driving. On November 22, 2002, the Company discontinued Blommaert's pay based on his failure to cooperate with its efforts to place him in a non-driving position. (Blommaert had failed to appear for a test to assess his qualification for an opening at Exxon Mobil's Joliet refinery.) On December 20, 2002, Slusher filed a grievance on Blommaert's behalf asserting that the Company's decision to suspend him without pay pursuant to the drug and alcohol policy amounted to a "unilateral change in terms of employment." GC Ex. 2. On January 10, 2003, while that grievance remained pending, Exxon Mobil terminated Blommaert for his failure to cooperate with the Company's efforts to reassign him and for his failure to provide the Company with information regarding the disposition of the DUI charge. (Evidently Blommaert was not convicted on the charge.)

In February 2003, during the investigation phase of the grievance regarding Blommaert's suspension, Slusher reviewed the personnel files of other unit employees to look for any evidence of disparate treatment in enforcement of Exxon Mobil's drug policy. Slusher had asked to see the files after hearing a rumor that driver Dan Breneisen had

a DUI incident in his past but was permitted to continue driving. Slusher discovered that Breneisen had indeed "checked off that box" on his compliance statement, indicating that he had a prior DUI incident. Tr. 25. On February 10, 2003, the Union's legal counsel notified Exxon Mobil that the Union would take the grievance over Blommaert's suspension to arbitration. The decision to arbitrate ended Slusher's involvement with the grievance.

Meanwhile, the 2000 CBA between the Union and Exxon Mobil had expired in April 2002, and by mid-February 2003, negotiations for a new agreement had reached an impasse. According to Matter, the drug and alcohol policy as well as the cost of health benefits were two of the primary issues that the Company and the Union could not agree upon.

The stalemate prompted the Union to schedule a strike vote among the members of the Local. Some unit members were opposed to a strike. One such individual, Michael Ostergaard, distributed flyers urging his fellow employees to vote against a strike. Slusher, who served on the Union's negotiating committee, confronted Ostergaard on February 11, 2003, and warned him that the Union might discipline him because the Union felt that the no-strike campaign was undermining its negotiating position with the Company. That confrontation prompted Ostergaard to complain to Exxon Mobil Fleet Supervisor Kevin Lozinak that Slusher had harassed him. Lozinak, who "had a million things going on at once," told Ostergaard to put his complaint in writing, which Ostergaard did on February 21, 2003. Tr. 323. On February 16, 2003, Local 705 members voted not to go out on strike.

On February 20, 2003, Slusher asked Breneisen whether he had a prior DUI. Breneisen acknowledged that he did. Slusher would later testify that he told Breneisen that he was interested in the DUI because he believed that the Company was enforcing its drug policy unevenly. Later that

same day, Breneisen complained about Slusher's inquiry to Lozinak. On Lozinak's advice, Breneisen put his complaint in writing.

On February 26, 2003, Breneisen filed a petition with the Board seeking to decertify the Union as the representative of Exxon Mobil employees at the Des Plaines and Lockport facilities. A vote on the decertification petition was scheduled for April 11, 2003.

In anticipation of the decertification vote, Tom Kaukialo, Exxon Mobil's Area Manager, met with Slusher on March 10 and engaged in a "give and take" regarding the parameters for decertification elections. Tr. 96. During that meeting, Kaukialo informed Slusher that he had "heard some complaints" that Slusher was harassing drivers with warnings that they would lose their jobs if the Union was decertified. Tr. 33.

On or about March 3, Slusher telephoned Matter and advised him of Breneisen's DUI. Matter instructed Slusher to "go do his research" and confirm the DUI through public records. Tr. 199. "[W]e don't want to make allegations that are not true," Matter would later testify. "[W]e wanted to be positive . . . ." Tr. 203. The Union subsequently asked Blommaert, who lived in the same town as Breneisen, to check the records at the local county courthouse.

On March 12, Matter met with 10 to 12 unit employees to discuss the status of contract negotiations and the upcoming decertification election. The subject of Exxon Mobil's drug and alcohol policy was broached, Matter would later recall, "because during negotiations it was such a heavy issue." Tr. 205. Breneisen was among the employees present at that meeting, and when the subject came up, Breneisen "got upset," informed the others that he had had a DUI, and advised them that "[i]t's nobody's business but my own." Tr. 205.

On April 5, Matter again met with Slusher and other unit members regarding the decertification election. Blommaert attended the meeting and produced to Slusher and Matter a copy of court record regarding Breneisen's prior DUI incident (the "abstract"). The abstract showed that Breneisen had been charged with driving under the influence of alcohol on September 24, 1995. Pursuant to an order entered on October 17, 1995, Breneisen had been placed on one year of supervision, fined in the amount of $995, required to attend a DUI school for six months, and also to participate in a victim-impact program. GC Ex. 4.[2] Blommaert asked Slusher why he had been fired and yet Breneisen was still driving. After reviewing the abstract, Matter instructed Slusher to pursue a new claim of disparate treatment on Blommaert's behalf. "Let's file our grievance on it," Matter told him. Tr. 213. The purpose of that grievance, Matter testified, "wasn't to take Dan [Breneisen] off the truck. It was to put Frank [Blommaert] back to work." Tr. 204. "[O]ur goal was to set preceden[ts]," he added. Tr. 204.

The following day, Sunday April 6, was Slusher's day off. Slusher went to the Des Plaines facility that morning looking for other drivers to talk with about the decertification election and to hand out materials concerning the competing proposals that the Company and the Union had made in the stalemated contract negotiations. While there, he gave copies of Breneisen's DUI abstract to unit members Rich Moreno and Roy Moscinski. Slusher would later testify that he showed the abstract to Moreno because he, like Blommaert, had been removed from driving duties due to a

---

[2] The charge apparently was resolved by agreement between the parties, although that is not entirely clear. The abstract makes reference to a "nolle prosequi bench trial," GC Ex. 4, which we gather was an alternative to resolution by way of a full-blown trial.

DUI incident and Moreno had a pending grievance challenging his reassignment. Slusher said that he showed the document to Moscinski to demonstrate why, from the Union's perspective, Exxon Mobil was applying its drug and alcohol policy in an uneven manner; indeed, according to Slusher, Moscinski asked to see the abstract. However, after looking at the abstract, both of the men told Slusher that they thought it was a confidential record, and Moreno actually returned his copy to Slusher. Slusher later acknowledged that he may also have given a copy of the abstract inadvertently to Michael Schaeffer, to whom he had handed a collection of papers regarding contract negotiations. Finally, Slusher also gave a copy of the abstract to Fleet Foreman Heisen, and he left a copy under Fleet Superviser Lozinak's door. Slusher later testified that he wanted them to be aware of Breneisen's record but did not want Breneisen removed from his driving position.

On April 7, Matter called Human Resources director Ellis and asked her if she was aware that Breneisen had a DUI in his history. Ellis said she was not aware of that. "If that [is] the case," Matter testified that he asked Ellis, "then why isn't Frank [Blommaert] put back to work[?] You have one fellow working with a DUI, yet another one's been suspended for it." Tr. 214. Ellis replied that she would get back to him.

On April 10, four days after Slusher circulated copies of Breneisen's abstract, Breneisen filed a complaint with Lozinak and Heisen alleging that Slusher had disclosed personal and confidential information about him to coworkers.

> Nick Slusher has taken personal and confidential records about me and has passed out photocopies to my fellow co-workers. This information was not given to him by me. This has caused me a great deal of stress because now co-workers are questioning my employ-

ment with Exxon Mobil. Nick has created a hostile work environment. He is trying to use this information to get me fired. I also believe his actions are a direct result of me filing for decertification from Local 705. Nick has made a point of bashing me both professionally and personally.

GC Ex. 11, Attach. 5. On the same day, Lozinak prepared a letter to Slusher formally notifying him that the Company had received "another complaint of harassment" but that, in order to avoid disrupting the forthcoming decertification vote, the Company would postpone its investigation into the complaint until after the election. GC Ex. 6. When he handed the letter to Slusher, Lozinak told him that Breneisen's complaint had been triggered by Slusher's circulation of the abstract.

On the following day, April 11, Slusher filed a second grievance on Blommaert's behalf. The grievance charged Exxon Mobil with "d[i]sp[a]rate treatment, unequal punishment, [and] bias." GC Ex. 5.

April 11 was also the date of the decertification vote. The members of the unit voted to decertify the Union as their representative. On April 14, the Board certified the result of the vote and thereby terminated the Union's representational status.

On April 14, Lozinak and Heisen met with Slusher to ask him about the distribution of Breneisen's abstract. There is a conflict in the testimony about what precisely Lozinak and Heisen asked him about distribution of the abstract and, more to the point, what Slusher said in reply. Lozinak testified that Slusher was twice asked whether he gave copies to anyone other than the two supervisors, and Slusher had replied that he did not. Slusher, on the other hand, testified that he was asked to name the individuals to whom he had given copies of the abstract, and that in response he said that he had given copies of the abstract to

Moreno and Moscinski in addition to both Lozinak and Heisen. Slusher also testified that he denied having distributed any copies of the abstract at the Lockport facility (where, according to Lozinak, a copy had been found). Slusher was told at the interview that the Company was suspending him pending the outcome of the investigation. Actually, by that point, the investigation was essentially complete: Lozinak already had obtained affidavits from both Moscinski and Schaeffer averring that Slusher had given them copies of the abstract. In the aftermath of the interview, Lozinak proposed that Slusher be terminated for lying about the persons to whom he had distributed Breneisen's abstract. All that remained is for the Company's Legal and Human Resources Departments to sign off on his recommendation, which they subsequently did.

Lozinak spoke by telephone with Slusher on April 23 and informed him that the Company was firing him for distributing the DUI abstract. Slusher's termination was confirmed in a letter that Lozinak issued that same day. The letter indicated that Exxon Mobil considered his circulation of Breneisen's abstract to be a violation of the Company's anti-harassment policy:

> Your mass distribution of personal information regarding a co-worker was designed to embarrass and humiliate him; to affect his employment opportunities; and to create a hostile work environment in violation of the policy. . . .

GC Ex. 7. In addition to harassment, the letter identified a second reason for Slusher's discharge, namely "lying in a Company investigation":

> [D]uring our official Company investigation, on April 14, 2003, you denied distributing the criminal abstract[ ] in question. Based on your statements, the Company has concluded that you lied during a Company investigation. As you know, lying in a Company investigation

>    is a serious, terminable offense and a violation of the
>    Company ethics policy.

*Id.* At the subsequent hearing before the ALJ, both Lozinak and Ellis testified that lying was the *sole* reason for the Company's decision to discharge Slusher. "He lied, that's it," Lozinak testifed. Tr. 378.

Slusher filed a charge on April 16 alleging that his suspension amounted to an unfair labor practice. He later amended the charge to cover his termination as well. On June 3, 2003, the Board's General Counsel issued a complaint alleging that Exxon Mobil had suspended and fired Slusher for filing, investigating, and otherwise processing grievances on behalf of the Company's employees and that because these are protected concerted activities under section 7 of the NLRA,[3] the Company had violated section 8(a)(1) and (3) of the Act.[4] The ALJ conducted a hearing on

---

[3] In relevant part, section 7 of the NLRA provides:

>    Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and *to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection* . . . .

29 U.S.C. § 157 (emphasis added). The pursuit of a grievance in accordance with the provisions of a collective bargaining agreement is one of the concerted activities protected by section 7. *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 836, 104 S. Ct. 1505, 1513 (1984). "Naturally, this protection extends to a union steward or official who aids another employee in filing a grievance." *Roadmaster Corp. v. NLRB*, 874 F.2d 448, 452 (7th Cir. 1989) (citing *Caterpillar Tractor Co. v. NLRB*, 638 F.2d 140, 141 (9th Cir. 1981)).

[4] Section 8 of the NLRA provides, in relevant part:

>    It shall be an unfair labor practice for an employer—
>                                                      (continued...)

the complaint on October 20 and 21, 2003.

Based on the evidence, the ALJ concluded that Slusher's conduct in showing and distributing copies of Breneisen's DUI abstract to members of the bargaining unit was in furtherance of his duties as a steward, was properly undertaken in a manner consistent with the NLRA, and was therefore a concerted activity protected by section 7 of the Act. Consequently, Exxon Mobil's suspension and discharge of Slusher (whether based on the notion that Slusher was harassing Breneisen and/or that he was not candid in answering the Company's questions about his distribution of the abstract) violated section 8(a)(1) of the Act. Underlying this conclusion was the ALJ's factual determination that Slusher distributed the abstract not to harass Breneisen but in order to demonstrate to Union members that the Company was not applying the drug and alcohol policy consistently and that the Union therefore had a meritorious claim of disparate treatment, the very type of claim that Slusher subsequently filed on behalf of Blommaert. Among other things, the ALJ found that:

(a) Slusher was a dedicated steward who "was punctilious in enforcing the [CBA]." *Exxon Mobil*, 2004 WL 2245467, at *9. The ALJ noted that the Union had opposed the application of Exxon's pre-merger drug and alcohol policy to Mobil

---

[4]  (...continued)

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the NLRA, 29 U.S.C. § 157];

. . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

29 U.S.C. § 158(a).

facilities on the ground that this was a change in working conditions that should have been negotiated between the Union and the Company. Slusher had filed at least three grievances challenging the enforcement of the drug policy vis-à-vis drivers in the bargaining unit. *Id.* at *8.

(b) Slusher had become aware of Breneisen's DUI incident in February 2003 while investigating Blommaert's first grievance. Once the incident had been confirmed, through public records as well as by Breneisen's own acknowledgment, Slusher concluded that the incident was evidence that the Company was treating some drivers like Breneisen more favorably under the drug and alcohol policy than it was Blommaert and other members of the bargaining unit. *Id.* at *10-*11.

(c) Once Slusher had obtained a copy of the abstract, "there was sufficient evidence to file the [disparate treatment] grievance, if not to oblige Slusher to pursue it." *Id.* at *24.

(d) The fact that Slusher distributed copies of the abstract after Breneisen moved to decertify the union, and the additional fact that it was a number of days after Slusher received and circulated the abstract before he filed the disparate treatment grievance, did not suggest that Slusher was out to harm Breneisen rather than to help Blommaert. Slusher had waited until he had proof of Breneisen's DUI incident before he disclosed it to other union members; and, at the same time, he filed the grievance within one week of receiving the abstract. "Thus, timing points more toward a proper, protected . . . purpose rather than a retaliatory purpose." *Id.*

(e) Slusher's motive in distributing the abstract was, in fact, legitimate rather than invidious. "In distributing the abstract, Slusher was not motivated by an intent to retaliate against or harm Breneisen, but rather to properly

pursue a claim of disparate treatment on behalf of a bargaining unit member." *Id.*

(f) Other employees, in the ALJ's view, had a right to know that the Company might be applying the drug and alcohol policy in a disparate manner. Those employees included not just individuals who, like Moreno, had pending grievances regarding the policy, but all members of the bargaining unit. *Id.* at *12.

(g) "Slusher had no reason to lie about whether he distributed the abstract to his bargaining unit members" and "Slusher did not lie when he was asked by Lozinak to name the persons to whom he had given the abstract, and he replied that he had given it to Moreno, Machinski [sic], Lozinak, and Heisen." *Id.* at *14 (footnote omitted). Slusher credibly testified that, inadvertently, he also may have given a copy of the abstract to Schaeffer. *Id.* However, the most that could be said with respect to his failure to name Schaeffer during the interview with Lozinak and Heisen was that he was simply mistaken. *Id.* at *14 & *26 n.10.

(h) "Slusher was a credible witness and his testimony on this matter was given in a candid, forthright manner." *Id.* at *14.

(i) By contrast, Lozinak, whose termination letter to Slusher had said that the discharge was based in part on the "mass distribution" of Breneisen's abstract, gave "contrived and incredible" testimony of what he meant by that description and, ultimately, "was not worthy of belief." *Id.* at *15.

(j) Exxon Mobil had changed its position as to the reason or reasons for Slusher's discharge. When Lozinak telephoned Slusher to inform him of his termination, he told Slusher that he was being fired for circulating Breneisen's abstract. The official termination letter that Lozinak subsequently wrote to Slusher then added lying as a second reason for the discharge. By the time of the hearing,

however, the Company was insisting that lying was the only reason for the discharge. "These shifting explanations undercut any claim of a lawful basis for Slusher's discharge, and make incredible the differing explanations put forward by the Respondent." *Id.* at *23.

By a 2 to 1 vote, the Board reversed the ALJ and ordered the dismissal of the General Counsel's complaint, concluding that Slusher had intended to harass Breneisen. The Board majority acknowledged the ALJ's finding that Slusher did not distribute Breneisen's abstract with the intent to harass Breneisen but rather to share with other members of the bargaining unit the basis for the disparate treatment grievance Slusher was pursuing on Blommaert's behalf. However, the majority believed that "[t]he record . . . supports a different interpretation." *Id.* at *1. In its view, the chronology of events indicated that Slusher's motive in distributing the abstract was to harm Breneisen. The majority emphasized the following sequence of events:

(1) On April 10, Breneisen filed a complaint with Exxon Mobil regarding Slusher's distribution of a personal and confidential record among his coworkers; and on that same day, the Company notified Slusher that it had received another complaint of harassment against him that it would investigate following the decertification election.

(2) On April 11, just prior to that election, Slusher filed the disparate treatment grievance.

(3) Slusher had learned of Breneisen's DUI by February 20 (when he asked Breneisen about it), yet he "took no steps to file a grievance until nearly 2 months later on the date of the decertification election." *Id.* at *2. The substantial delay "shows that Slusher's object in circulating the DUI record was to harass Breneisen, who he knew was subject to discharge under [Exxon Mobil's] strict drug and alcohol policy if it was determined by the [Company] that Breneisen had failed to disclose the DUI-incident." *Id.*

(4) "The grievance filing itself came only after Slusher was told of [Exxon Mobil's] investigation of the harassment complaint against him, and as the Union was being decertified." In that context, "the April 11 grievance filed by Slusher was a cloak to provide cover for the circulation of the DUI report." *Id.*

(5) Finally, although Slusher filed the disparate treatment grievance purportedly on Blommaert's behalf, the CBA required that a grievance be filed within 30 days of the underlying occurrence. Yet Blommaert had been discharged on January 10, and Slusher did not file the disparate treatment grievance until more than 90 days later. Slusher as a veteran steward surely knew that the grievance was beyond the deadline established by the CBA.

The dissenting member of the Board, having in mind the credibility assessments and factual findings rendered by the ALJ, believed that the majority had gone astray in ascribing an improper motive to Slusher. "The majority's depiction of steward Slusher's protected grievance activity as unprotected harassment of Breneisen is simply unfounded." *Id.* at *5. The dissent pointed out that the ALJ had considered the timing of Slusher's conduct and rejected the notion that it bespoke retaliation on Slusher's part.

> The record fully explains, and the judge specifically addressed, the chronology the majority posits as suspect. Slusher waited to file the grievance until he received confirmation of Breneisen's DUI incident. He did not obtain that confirmation via the court abstract until April 5, and he filed the grievance within 1 week of his receipt of it, and showed the abstract within that same week. As the judge found, "timing points more to a proper, protected purpose than a retaliatory purpose." The fact that Slusher filed the grievance on the date of the decertification election is easily explained; there is no dispute that Slusher was an extremely aggressive steward who would continue representing employ-

> ees—and filing grievances—until the very minute that representation ceased. And that is what he did.

*Id.* The dissent noted further that the ALJ had expressly credited Slusher's testimony that his intent in circulating the abstract was not to harass Breneisen for his anti-union stance but to pursue relief on behalf of Blommaert and to force Exxon Mobil to treat employees equitably. "The majority's speculation that Slusher sought to have Breneisen fired is baseless, and ignores that Slusher initiated the entire sequence of events—by asking Breneisen whether he had a DUI—*before* Breneisen had even filed the decertification petition." *Id.* (emphasis in original).

## II.

This court will uphold the Board's dismissal of a complaint so long as its factual findings are supported by substantial evidence and its legal conclusions have a reasonable basis in law. *NLRB v. Int'l Bhd. of Elec. Workers, Local Union 16*, 425 F.3d 1035, 1039 (7th Cir. 2005); 29 U.S.C. § 160(e). By "substantial evidence," we mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *NLRB v. Erie Brush & Mfg. Corp.*, 406 F.3d 795, 801 (7th Cir. 2005); *NLRB v. Midwestern Pers. Servs., Inc.*, 322 F.3d 969, 976 (7th Cir. 2003); *Kopack v. NLRB*, 668 F.2d 946, 951 n.3 (7th Cir. 1982). Where the record evidence is susceptible of different interpretations, it is not our province to decide which of them is correct. Thus, we cannot " 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.' " *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 260, 88 S. Ct. 988, 991-92 (1968) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S. Ct. 456, 465 (1951)); *Midwestern Pers. Servs.*, 322 F.3d at

976. A party challenging the Board's factual assessments thus bears the burden of showing that they are not supported by substantial evidence. *Erie Brush & Mfg. Co.*; 406 F.3d at 801; *NLRB v. Tom Wood Datsun, Inc.*, 767 F.2d 350, 352 (7th Cir. 1985).

As the Board's order makes plain, the key issue in this case is Slusher's motive in distributing copies of Breneisen's abstract. Whereas the ALJ found that Slusher circulated the abstract in order to demonstrate to other members of the bargaining unit the basis for pursuing a disparate treatment grievance against Exxon Mobil, the Board majority found that he did it in order to harass Breneisen for opposing and seeking to decertify the Union.

The nature of a party's motivation in committing a particular act is, of course, a question of fact. *E.g.*, *SCA Tissue N.A. LLC v. NLRB*, 371 F.3d 983, 988 (7th Cir. 2004); *E & L Transp. Co. v. NLRB*, 85 F.3d 1258, 1268 (7th Cir. 1996); *Central Transp., Inc. v. NLRB*, 997 F.2d 1180, 1191 (7th Cir. 1993). Like other aspects of a person's state of mind, one's motive is rarely proved directly. *See, e.g.*, *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005); *Justak Bros. & Co. v. NLRB*, 664 F.2d 1074, 1077 (7th Cir. 1981). Typically, a mental state is established inferentially based on the totality of the evidence, including the credibility of the witnesses who testify before the finder of fact. *See, e.g.*, *Market St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 597-98 (7th Cir. 1991); *Thor Power Tool Co. v. Weintraub*, 791 F.2d 579, 583-84 (7th Cir. 1986).

As a factual determination, then, the Board's finding as to one's motive is conclusive if it is supported by substantial evidence on the record considered as a whole. In its factfinding, however, the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522

U.S. 359, 378, 118 S. Ct. 818, 829 (1998). "Courts perform-ing substantial evidence review, therefore, must examine whether the Board considered all of the reasonable infer-ences compelled by the evidence in reaching its decision." *Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 514 (4th Cir. 1998) (citing *Allentown Mack Sales & Serv.*, 522 U.S. at 378-79, 118 S. Ct. at 829).

In this case it is the Union that is challenging the Board's decision, and so, as we have noted, the Union bears the burden of convincing us that the Board's findings lack the support of substantial evidence. The fact that the Board assessed the evidence differently than did the ALJ does not alter that burden, because it is the independent validity of the Board's order that we examine. *See Universal Camera*, 340 U.S. at 496, 71 S. Ct. at 469; *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1319 (7th Cir. 1991) (en banc); *NLRB v. Roll & Hold Warehouse & Distrib. Corp.*, 162 F.3d 513, 517 (7th Cir. 1998); *Weather Shield Mfg, Inc., Millwork Div. v. NLRB*, 890 F.2d 52, 57 (7th Cir. 1989). Yet, the Board's decision to reject the ALJ's factual findings does give rise to "'a special problem of administrative review.'" *NLRB v. Stor-Rite Metal Prods. Inc.*, 856 F.2d 957, 964 (7th Cir. 1988) (quoting *Stokley-Van Camp, Inc. v. NLRB*, 722 F.2d 1324, 1328 n.8 (7th Cir. 1983)). On consideration of the record, the Board enjoys the prerogative to make factual findings independent of and even contrary to those of the ALJ. *E.g.*, *Universal Camera*, 340 U.S. at 492, 71 S. Ct. at 467. However, "on matters which the [ALJ], having heard the evidence and seen the witnesses, is best qualified to decide, the agency should be reluctant to disturb his findings unless error is clearly shown." *Id.* at 494, 71 S. Ct. at 468.[5] For purposes of our review, the ALJ's decision

---

[5] The Board itself has a long-established policy "not to over-
(continued...)

(including his findings of fact) is as much a part of the record as the evidence put before the ALJ, and we must consider the ALJ's views in deciding whether the Board's order is supported by substantial evidence. *Universal Camera*, 340 U.S. at 493, 71 S. Ct. at 467; *see also Stor-Rite*, 856 F.2d at 964.

Cognizant of the special concerns raised by the Board's rejection of an ALJ's factual findings, we have articulated the following "general propositions to guide our review of a Board decision":

   1.  In all cases, the standard of review is the "substantial evidence" standard.

   2.  Because the ALJ's report is a part of the record with independent significance, a factual determination of the Board that departs from the findings of the ALJ stands on weaker ground than one that does not.

   3.  Because only the ALJ can view the demeanor of the witnesses, any of the ALJ's findings that turn on express or implied credibility determinations take on particular significance on review.

*Weather Shield Mfg.*, 890 F.2d at 57 (quoting *Stor-Rite*, 856 F.2d at 964); *see also U.S. Marine Corp.*, 944 F.2d at 1319 n.16. We have added that when the Board has rejected an ALJ's credibility assessment (express or implied) in reaching a particular determination, "then the Board's conclusion

---

[5] (...continued)
rule a hearing officer's credibility resolutions unless a clear preponderance of all the relevant evidence convinces [the Board] they are incorrect." *Robert F. Kennedy Med. Ctr.*, 336 NLRB 765, 765 n.2 (NLRB 2001) (citing *Stretch-Tex Co.*, 118 NLRB 1359, 1361 (NLRB 1957)); *see also Standard Dry Wall Prods., Inc.*, 91 NLRB 544, 545 & n.3 (NLRB 1950) (coll. cases), *enforced*, 188 F.2d 362 (3d Cir. 1951) (per curiam).

is subject to special scrutiny rather than merely the substantial evidence test." *Weather Shield*, 890 F.2d at 58. *See Mobil Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 261 n.2 (5th Cir. 1999) (Garza, J., dissenting) (collecting cases holding that court engages in heightened scrutiny when Board rejects ALJ's factual findings); *see also, e.g.*, *Pirelli Cable Corp.*, 141 F.3d at 515 (Board decision based on credibility determinations different from those of the ALJ are subject to "closer scrutiny").

A person's motive is, as we have said, a factual matter, and the ALJ's finding as to Slusher's motive necessarily rests in significant part on the judge's assessment of Slusher's credibility. Slusher, of course, testified before the ALJ that he did not intend to harm Breneisen when he distributed the abstract, and the ALJ found Slusher believable in that regard. By contrast, the ALJ found Lozinak, who had interviewed Slusher on the subject of the distribution and concluded that Slusher was lying about it, not credible. So to the extent that the Board's decision, in finding that Slusher was motivated by a desire to punish Breneisen for his anti-Union views, rejected the ALJ's credibility assessment, it stands on weaker ground with us than it otherwise might and we must give it special scrutiny. *Weather Shield*, 890 F.2d at 57-58; *see also Universal Camera*, 340 U.S. at 496, 71 S. Ct. at 469 (significance of hearing officer's findings depends on extent to which witness credibility is important).

Initially, in an effort to fend off such scrutiny, the Board's General Counsel suggests that the Board did not, in fact, reject any of the ALJ's factual findings, including his credibility assessments. General Counsel Br. 38. As the General Counsel points out, the Board did not say that it was rejecting any of the ALJ's credibility determinations, and a footnote in its order includes boilerplate language indicating that the Board was adopting the ALJ's findings insofar as they were consistent with the Board's own

decision. 2004 WL 2245467, at *1 n.1. But, as the Union is quick to add, that language makes clear that the Board was adopting the ALJ's findings "only" to the extent they were consistent with the Board's own order. *Id.* The ALJ's finding as to Slusher's motive cannot plausibly be described as being "consistent" with the Board's decision. It simply is not possible to reconcile the Board's finding that Slusher meant to harass Breneisen with the ALJ's finding that Slusher's testimony disavowing any such motive was forthright, candid, and ultimately credible. Thus, although it did not say so expressly, the Board necessarily rejected the ALJ's finding that Slusher's motive was benign and his related determination that Slusher's testimony on this point was credible. *See Weather Shield*, 890 F.2d at 58-59 (rejecting contention that Board had accepted ALJ's credibility assessments, when in overruling ALJ's determination, Board relied on witnesses that ALJ had implicitly discredited and necessarily rejected other testimony that ALJ had expressly credited); *NLRB v. Hawkins Constr. Co.*, 857 F.2d 1224, 1228 (8th Cir. 1988) (rejecting Board's effort to "evade" credibility-based assessment of whether union's request for information as to Company's hiring and subcontracting practices was made in good faith or to harass Company in retaliation for suit against union); *Ewing v. NLRB*, 732 F.2d 1117, 1122 (2d Cir. 1984) (rejecting Board's attempt to divorce trial examiner's credibility assessment from analysis of evidence and derivative inferences as to whether Company's failure to recall employee from layoff was motivated by suspicion that employee had reported Company to regulators and triggered inspection); *Leviton Mfg. Co. v. NLRB*, 486 F.2d 686, 690 (1st Cir. 1973) (reversing Board in case turning on whether ousted union officials had filed suit against Company, union and their officers in good faith or for purpose of harassment, where Board's decision did "not respond[ ] at all to the credibility aspect of the trial examiner's findings and . . . seemingly rejected out

of hand the testimony which he credited as to the employees' continued harassment activities").

Unavoidably, then, this is a case where we must give the Board's decision the special scrutiny we alluded to in *Weather Shield*. As always, the ultimate question is whether the Board's decision, including its finding as to Slusher's motive, is supported by substantial evidence; but in answering that question, we must consider whether the Board had a plausible basis for rejecting the ALJ's own finding as to Slusher's motive and his subsidiary assessment of Slusher's credibility. The ALJ's decision constitutes an important part of the record that we look to in deciding whether the Board's own decision is supported by substantial evidence, and to the extent that the ALJ evaluated the evidence differently than the Board did, the Board cannot simply ignore his findings.

Notably, the Board did not, in its decision, recount the evidence, derivative inferences, and credibility assessments that led the ALJ to conclude that Slusher's motive in distributing Breneisen's abstract was a proper, protected motive. After acknowledging the ALJ's finding, the Board simply said that "the record . . . supports a different conclusion." 2004 WL 2245467, at *1. So the Board did not articulate a basis for its decision to reject the ALJ's reasoning on this subject. The General Counsel, in his brief, has made some effort to reconcile the Board's decision with the evidence that led the ALJ to reach a different assessment of Slusher's motive. On its face, however, the Board's order reflects no such effort, and it is the Board's decision alone that we review. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69, 83 S. Ct. 239, 246 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; . . . an agency's discretionary order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself . . . ."); *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S. Ct. 454, 459 (1943);

*NLRB v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506, 517-18 & n.16 (7th Cir. 1991).

What the Board focused on in its order was the chronology of events surrounding Slusher's distribution of the abstract. In the Board's view, it was significant that Slusher was aware no later than February 20 that Breneisen had a DUI incident in his past, yet nearly two months passed before Slusher filed the disparate treatment grievance on Blommaert's behalf. By that point, the Board believed, any grievance related to Blommaert's discharge in January was untimely. The Board also thought it significant that Slusher filed the grievance on April 11, the day after he was notified that the Company had received another complaint of harassment against Slusher and that it would be investigating his circulation of Breneisen's abstract following the decertification vote. This sequence of events suggested to the Board that Slusher's real purpose in circulating Breneisen's abstract was to penalize Breneisen for seeking to decertify the union, and that Slusher filed the disparate treatment grievance in an effort to provide cover for his harassment of Breneisen.

As the timing of events is the sole reason identified by the Board for its finding as to what Slusher's motive was, and the Board gave no independent reasons for rejecting the ALJ's contrary assessment of Slusher's motive, we must consider whether the chronology cited by the Board is so compelling as to permit the Board to reject the ALJ's evaluation of the evidence (including his credibility assessments) without further explanation. Having considered the record as a whole, we conclude for the following reasons that the chronology of events is not so compelling as to relieve the Board of this obligation.

It is undisputed on this record that Exxon Mobil's drug and alcohol policy was a subject of interest to both Slusher and other members of the Union. The merger between

Mobil and Exxon had resulted in the extension of Exxon's stricter pre-merger policy to Mobil's workforce and had resulted in the reassignment and discharge of Union members. Slusher, who was an aggressive Union advocate, had filed multiple grievances involving the policy. The policy was an issue in the stalemated negotiations between Local 705 and the Company over a new CBA. Against that backdrop, evidence that Exxon Mobil might be applying the drug and alcohol policy inconsistently—particularly in a manner that might favor drivers like Breniesen who were opposed to the Union—was of genuine interest to Union members. Slusher's testimony on this point is supported by the testimony of both Matter (who instructed Slusher to obtain proof of Breneisen's DUI and, after seeing the abstract, to file a grievance) and Blommaert (who said that he wanted the disparate treatment grievance pursued on his behalf).

Slusher's actions could be viewed as consistent with pursuing a disparate treatment grievance in good faith, notwithstanding the sequence of events that the Board chose to highlight in its order. Although Slusher learned that Breneisen had a DUI incident in February 2003, he was instructed by Matter to obtain proof of that incident by checking public records, and Slusher did not have that proof in hand until April 5. The desire for documentation is not inherently suspicious; on the contrary, the record suggests that the court abstract may have provided a number of details about the incident that Slusher did not otherwise learn from reviewing Company records and speaking with Breneisen. On Matter's instruction, Slusher filed the grievance six days after he received the abstract from Blommaert, with two of those days being a weekend (Slusher received the grievance on a Saturday). Like the ALJ, we cannot see anything inherently suspicious in Slusher's failure to file the grievance more quickly. It is easy to imagine any number of innocent explanations for the short delay, particularly in view of the impending

decertification vote. There certainly was no emergency at that juncture: Blommaert, as the Board majority pointed out, had been discharged in January, so waiting a few more days was not going to make a difference in terms of the relief available to Blommaert. And although the Board majority suggested that Slusher must have appreciated the likelihood that any grievance filed in April challenging Blommaert's discharge in January would be deemed untimely in view of the CBA's 30-day time limit on grievances, the Board itself abstained from judgment as to whether the grievance was contractually time-barred. 2004 WL 2245467, at *2 n.4. It appears at least arguable that it was not, as the Board dissenter pointed out, given that the Union did not learn of Breneisen's DUI history until February (possibly after the 30-day period had already expired) and did not have proof of the incident until April. *Id.* at *6 n.8.

In gross respects, at least, the abstract of Breneisen's DUI incident arguably did suggest that the Company might not be applying its drug and alcohol policy in an evenhanded fashion. The abstract revealed that Breneisen, pursuant to the disposition of the 1995 DUI charge, was ordered to pay a substantial fine and to participate in a remedial DUI "school." The abstract's description of the proceeding suggests that this may not have been a conviction in the usual sense, as Slusher thought it was, but rather an alternative disposition. *See supra* n.2. Moreover, as the General Counsel points out, the incident was more than five years old, and as such the policy would have left it to the Company's discretion whether to reassign Breneisen rather than automatically bar him from driving tankers. But the record contains no evidence as to what Exxon Mobil's rationale actually was in dealing with Breneisen's incident. In fact, when Matter contacted Ellis after seeing the abstract and asked her if she was aware of the incident, she said (according to Matter) that she was not. On this record,

one cannot say that Slusher had no good faith basis for pursuing a disparate treatment grievance.

The facts are also consistent with the possibility that Slusher, in circulating copies of Breneisen's DUI abstract, meant not to harass Breneisen for his opposition to the Union but rather to alert members of the bargaining unit, and in addition Exxon Mobil management, that the Company might be enforcing its drug and alcohol policy in an inconsistent manner. Slusher testified that he was initially able to confirm the rumor that Breneisen had a DUI history because Breneisen himself had "checked off that box" on his compliance statement, indicating that he had a DUI incident in his past. Tr. 25. The record admittedly does not tell us how much detail Breneisen had provided about the incident on that statement—whether, for example, he disclosed his participation in a DUI school. *See* 2004 WL 2245467, at *11.[6] And according to Matter, Ellis had expressed ignorance when he raised Breneisen's DUI with her. But the record is uncontradicted on the point that Breneisen had disclosed the fact of his prior DUI on the compliance statement and that Breneisen himself had acknowledged the DUI to Slusher. So there is no reason to think, as the Board majority apparently did, that this was an entirely undisclosed incident and that Slusher's circulation of the abstract might expose Breneisen to discharge for a lack of candor. Moreover, while insisting that the incident was no one's business but his own, Breneisen himself had acknowledged the incident not only to Slusher but also to

---

[6] Breneisen's compliance statement is not in the record, and because Breneisen himself was not called as a witness, we do not have the benefit of his testimony as to precisely what he said about the DUI incident on his compliance statement. *See* 2004 WL 2245467, at *11. Slusher's testimony discloses only that Breneisen checked the box indicating that he had a prior DUI.

the 10 or 12 persons present at the March 12 meeting of the bargaining unit, so the incident was by no means a secret by the time Slusher circulated the abstract. The abstract itself was a public record, and in view of the discontent among members of Local 705 regarding the Company's drug and alcohol policy, the stalemated contract negotiations, and the upcoming decertification vote, the possibility of disparate treatment under the policy, particularly as between pro and anti-Union drivers, was (at least arguably) of interest to members of the Union other than Slusher and Blommaert. And the fact that two of the people to whom Slusher circulated copies of the abstract—Lozinak and Heisen—were members of management reasonably could be viewed as evidence that Slusher's aim was indeed to challenge Company policy rather than to harm Breneisen.

We certainly agree with the Board that the evidence does not foreclose the possibility that Slusher's actual motive in distributing the abstract was to harass Breneisen; but neither does it preclude the ALJ's contrary finding. And as this was a case where there was no smoking gun that supplied definitive proof of what Slusher's motive was, Slusher's own testimony as to his state of mind and, in turn, his credibility as a witness, were crucial, along with the testimony and credibility of other individuals (such as Matter and Blommaert) who were involved in the investigation of Breneisen's DUI history and pursuit of the disparate treatment grievance.

The credibility component of this case, in short, cannot be ignored. Of all the adjudicators who have considered the evidence in this case, the ALJ has the distinct advantage of being the only one to have heard these witnesses and observed their demeanor on the witness stand. His credibility assessments were inextricably intertwined with his finding that Slusher's motive in circulating the abstract was benign. The Board has supplied us with no reason to question (let alone reject) the ALJ's credibility-based

findings, and having reviewed the record ourselves, we have discerned none. Instead, the Board's decision reads as if, given the sequence of events, there is only one plausible answer as to what Slusher's motive was, regardless of what Slusher and the other witnesses had to say about his motive. For the reasons we have discussed, however, that chronology leaves room for the conclusion that Slusher distributed Breneisen's abstract for a lawful and protected purpose. Because the Board articulated no other basis on which to reject the ALJ's credibility-based finding that Slusher did not mean to harass Breneisen, we can only conclude that the Board's contrary assessment of Slusher's motive lacks the support of substantial evidence on the record as a whole.

The Board's sole basis for reversing the ALJ's decision and ordering the dismissal of Slusher's complaint was that Slusher's distribution of the abstract was not activity that fell within the protection of NLRA section 7, a conclusion dependent on the Board's finding that Slusher's motive was illicit. For the reasons we have discussed, the Board's finding as to Slusher's motive cannot stand. The ALJ, who permissibly found that Slusher was not motivated by a desire to harass Breneisen, concluded that Slusher's conduct was protected by section 7 and that Exxon Mobil had suspended and discharged Slusher based on that protected conduct in violation of section 8(a)(1) of the Act. The Board did not otherwise address, let alone find fault with, those aspects of the ALJ's decision. Notably, the ALJ's assessment of the Company's reason for discharging Slusher was also based on the judge's assessment of the credibility of the witnesses. Having been given no reason to question the balance of the ALJ's decision, the order of the ALJ granting relief to Slusher must be reinstated.

## III.

Because the Board's order lacks the support of substantial evidence on the record as a whole, we grant the petition for review, reverse the Board's order, and direct that the ALJ's order be reinstated.

A true Copy:

    Teste:

                _____
                *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*