

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-28-2006

# Shah v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-3607

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Shah v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1169.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1169

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 04-3607 and 05-1122

———————

SEEMAB FATIMA SHAH;
KHURRAM AIJAZ,
                                    Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                    Respondent

———————

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency Nos. A95-148-835 & A95-148-836
Immigration Judge: Hon. Donald V. Ferlise

———————

Argued January 9, 2006

———————

Before: BARRY and AMBRO, <u>Circuit Judges</u>, and
DEBEVOISE,[*] <u>District Judge</u>

———————

(Opinion Filed: April 28, 2006)

———————

David E. Piver, Esq. (ARGUED)
W. John Vandenberg, Esq.

———————

[*] The Honorable Dickinson R. Debevoise, Senior District
Judge, United States District Court for the District of New
Jersey, sitting by designation.

Law Office of David E. Piver
150 Strafford Avenue, Suite 115
Wayne, PA    19087

Counsel for Petitioners

Jonathan Cohn, Esq. (ARGUED)
United States Department of Justice
Civil Division
950 Pennsylvania Avenue
Washington, D.C.  20530
        -AND-
John J. Andre, Esq. (ARGUED)
Donald E. Kenner, Esq.
Christopher C. Fuller, Esq.
Thankful T. Vanderstar, Esq.
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, D.C.  20044
        -AND-
Christine A. Sanner, Esq.
Office of United States Attorney
17 South Park Row, Room A330
Erie, PA   16501

Counsel for Respondent

---

OPINION OF THE COURT

---

BARRY, Circuit Judge

## I.  Introduction

Petitioner's father was killed in cold blood, and the

government concedes that he is dead. That murder – and what preceded and followed it – is the event on which her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT") was almost exclusively based. In his apparent zeal to deny relief to petitioner, however, the Immigration Judge, Donald V. Ferlise, came to the conclusion that the father is alive.

> [T]he Court is strongly persuaded and tends to believe that the respondent's father is indeed alive and is not dead . . . If this is true then the respondent's entire case dissolves right in front of our eyes . . . . the case is nothing but a fraud that is being perpetrated upon this Court.

(App. at 18; *see also id*. at 19 ("[T]he fact that the respondent's father is indeed alive . . . is a very, very important issue in this case.").) In concluding that the father is alive, Judge Ferlise utterly ignored undisputed evidence of the father's death and shored up his conclusion with evidence he had excluded, evidence that actually corroborated the fact of the father's death. His conclusion "do[es] not flow in a reasoned way from the evidence of record and [is] . . . arbitrary and conjectural in nature." *Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir. 2003) (en banc). It is "more puzzling than plausible, more curious than commonsense." *Id*. at 251. The petition for review will be granted, and the case will be remanded for further proceedings consistent with this opinion.[1]

## II. Facts and Procedural History

Seemad Fatima Shah has a Master of Arts in International Relations from the University of Karachi. She and her husband,

---

[1] We are today issuing another opinion in which we criticize Judge Ferlise's conduct. *See Cham v. Gonzales*, No. 04-4251 (3d Cir. 2006). These opinions are not the first in which we have done so. *See*, *e.g.*, *Sukwanputra v. Gonzales*, 434 F.3d 627 (3d Cir. 2006); *Fiadjoe v. Attorney General*, 411 F.3d 135 (3d Cir. 2005).

Khurram Aijaz, are natives and citizens of Pakistan. They are both Shi'a Muslims and Mohajirs (a/k/a Muhajirs).[2] Shah and Aijaz entered the United States on October 8, 2000 as nonimmigrant visitors authorized to remain here through April 7, 2001. On May 25, 2001, Shah, in addition to seeking withholding of removal and relief under the CAT, submitted an application for asylum on behalf of herself and her husband.[3] In the application, Shah stated that she was seeking asylum for the following reason:

> I am a Mohajir (IMMIGRANT), my family and I worked for Muttahida Qaumi Movement.[4] I am an active member of MQM ladies Wing. I am also of SHIA sect. For a long time Mohajirs are being persecuted in Karachi-Pakistan. Shia's are also being killed by Fanatic Muslims who are against the existence of Shia's in Pakistan.
>
> My father Syed Abid Hussain was killed by terrorist on 01-10-1995, he was shot dead by the persons who are patronized by Police . . . . There

---

[2] The State Department defines Muhajirs as "Urdu-speaking immigrants from India and their descendants." U.S. Department of State, *Background Notes: Pakistan*, available at http://www.state.gov/r/pa/ei/bgn/3453.htm (last visited Mar. 22, 2006).

[3] Although Aijaz is nominally a petitioner, Shah, and what happened to her father and to her, is the driving force behind these applications. We will, therefore, refer to petitioner in the singular.

[4] The Muttahida Qaumi Movement ("MQM"), "formerly known as the Mohajir Quami Movement, is a political group which represents the Urdu-speaking immigrant urban Mohajir population which migrated from India at the time the creation of Pakistan in 1947." Global Security.org, http://www.globalsecurity.org/military/world/para/mqm.htm (last visited Mar. 22, 2006).

were two main factors for his killing, First he was Mohajir (IMMIGRANT) . . . , Second He was SHIA, they too are being victim of persecution.

Since the killing of my father, my whole family was uprooted we could not live properly in Pakistan, we were unable to live in any part of Pakistan as police and other security agencies threatened severe consequences os we try name the culprits. My life was in continuous danger, I was not free to move freely due to continuous threats by security agencies as well as by fundamentalist who are being given full protection by the government.

In the month of September 2000 security agencies threatened me and family of severe consequences if we try to proceed further for the inquiry of fathers killing, so mother who is very upset after the death of my father advised me to leave Pakistan immediately, so I had to leave Pakistan in a hurry as my life was in danger, I had to leave my newly born son also. For this reason I am seeking asylum in United States.

(App. at 300.)

Shah submitted a supplemental statement in support of her application for asylum. In it, she provided additional information about the MQM and the violence allegedly perpetrated against MQM members by the Muslim League and the Pakistani army. "From 1992 until the present," she wrote, "more than 17,000 people have been tortured and killed." (*Id*. at 153.) She also spoke of her father and his death:

My father was a well-known, active and respected unit leader of the local chapter of the MQM. My father was visiting his friend, who was a doctor and also a Mohajir, at his office. Suddenly, members of the ISI, or Special Services

5

Intelligence, burst into the office and shot my
father and his friend in cold blood.

(*Id.*) After her father's death, she was threatened, followed,
harassed, and told not to attend MQM meetings and not to look
into the circumstances surrounding his death. On one occasion,
four or five men, two of whom were wearing police uniforms,
burst into her house, took her seven-month-old son out of her
arms, and told her that she and her family would be killed if she
did not stop her involvement with the MQM.

On April 21, 2003, Shah and Aijaz appeared before Judge
Ferlise. Shah and one other witness, Mohammad Hussain,
testified, Hussain going first.[5] Hussain was an active member of
the MQM, both in Pakistan and in the United States, and Shah's
father had been very active with the MQM in Pakistan until he
was shot to death by the ISI in 1995. He explained the
difficulties that the MQM continues to have in Pakistan – MQM
members have seats in the assembly, for example, but are not
given any actual authority. According to Hussain, Shah attended
MQM meetings in Pakistan and has been very active in Gehwar-
e-abad, the American branch of the MQM.

Shah then provided testimony consistent with her prior
statements. Her father was an active member of the MQM.
After receiving phone calls from men threatening to kill him, he
was shot to death by the ISI while visiting a friend at his medical

_____

[5] Shah also proffered letters from two individuals
claiming to be current or former officials of the MQM. The
letters stated, in substance, that Shah is an active MQM member,
and that she would be in danger if forced to return to Pakistan.
Because the authors were not available to appear in court, and
the statements were letters, not affidavits, Judge Ferlise
concluded that he would give them whatever weight he deemed
advisable which, apparently, was none. *See Liu v. Ashcroft*, 372
F.3d 529, 532 n.3 (3d Cir. 2004) ("[T]he fact that the IJ never
referred to the certificates in his final decision suggests that they
were not given any weight in making the ultimate decision.").

clinic in January 1995. Shah started attending MQM meetings with her father in 1990, and worked for the MQM's women's wing educating women about their rights. After her father was killed, she became more active in the MQM, and sought to have the men who killed him punished. She began receiving threatening phone calls, sometimes as many as three or four a day. In addition to these phone calls, men would come to the newspaper where she worked and tell the security guards that they were going to kill her when she left the building. On June 18, 2000, five men broke into her home and grabbed her son from her arms. They pulled her hair, threw her on the floor, kicked her, and cursed at her. They told her to stop working with the MQM, and to stop pursuing the men who killed her father. Shah expressed fear that she will be killed if forced to return to Pakistan.

Shah and Aijaz offered extensive documentary evidence in support of their claims.

> "(a) Copy of 1-94 card of Respondents
> (b) Copy of Primary Respondent's [Shah's] Passport
> (c) Copy of Secondary Respondent's [Aijaz's] Passport
> (d) Birth Certificate of Primary Respondent, with translation
> (e) Marriage Certificate of Respondents, with translation
> (f) Birth Certificate of Respondents common child, with translation
> (g) Primary Respondent's Educational Credentials
> (h) *The Dawn* identification card [English newspaper where Shah was employed]
> (i) Copy of Passport of Primary Respondent's father
> (j) Death Certificate of Primary Respondent's father
> (k) First Information Report for Police dated October 1, 1995, with translation
> (l) Extract of Entries of Death Registered with

Health Department regarding death of respondent's father, with translation

(m) Letter to Deputy Commissioner of Karachi from Assistant Commissioner dated January 11, 1995 regarding Respondent's father

(n) Letter of Chief Administrative Officer regarding special gratuity paid at time of Respondent's father's death

(o) Articles from *The Dawn [and the Daily] Mashriq*, dated January 11 through January 31, 1995, regarding death of Primary Respondent's Father

(p) Confirmation of Primary Respondent's hire at Zibercom and subsequent pay raises

(q) Letter of Recommendation for Primary Respondent

(r) Letter of Termination for Primary Respondent

(s) Tax information for Primary Respondent

(t) *The Dawn* Internet Edition Articles on Pakistan dated January 5, 2001 through August 20, 2001

(u) Copy of Pakistan Human Rights Watch World Report 2001."

(App. at 184); s*ee* Exhibit 4 (*Id*. at 184-292.)  Judge Ferlise excluded documents (a) through (n) on the ground that they were not certified pursuant to 8 C.F.R. § 287.6(b)(1)-(2), which states, in relevant part:

> In any proceeding under this chapter, an official record or entry therein, when admissible for any purpose, shall be evidenced by an official publication thereof, or by a copy attested by an officer so authorized. . . . The attested copy, with the additional foreign certificates if any, must be certified by an officer in the Foreign Service of the United States, stationed in the foreign country where the record is kept.

Notably, he did not exclude the newspaper articles at (o).

8

In an oral opinion issued at the conclusion of the hearing, Judge Ferlise found the testimony of both Hussain and Shah "totally incredible"; denied asylum, withholding of removal, and relief under the CAT; and deemed the application for asylum "frivolous." On appeal, the Board of Immigration Appeals ("BIA") reversed the finding of frivolousness, but dismissed the appeal "based upon and for the reasons set forth" in Judge Ferlise's decision. (*Id*. at 3.) A petition for review was filed with this Court and motions to reconsider and for a stay of removal with the BIA. By order dated December 29, 2004, the BIA denied the motions, and a petition for review of this decision was filed as well. We consolidated the two petitions for review.

On appeal, Shah contends, first, that substantial evidence did not support the adverse credibility determinations and denial of relief. She argues, as well, that incompetent translation by the Urdu-English interpreter deprived her of her due process right to a full and fair hearing, that Judge Ferlise's decision to exclude some of the documentary evidence under 8 C.F.R. § 287.6 was legal error requiring a remand, and that the BIA abused its discretion when it denied the motion to reconsider.[6] We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1).

### III. Standard of Review

Where, as here, "the BIA directs us to the opinion and decision of the IJ who originally assessed [the] application, we review the IJ's opinion." *Dia*, 353 F.3d at 240. We review an immigration judge's findings of fact and credibility determinations under a substantial evidence standard. *See, e.g.*, *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). In so doing, we ask

---

[6] Because we are remanding for another hearing, we need not reach the question of whether the translation and exclusion of evidence issues were preserved for appeal and, if so, whether the BIA abused its discretion in rejecting the latter issue and denying the motion for reconsideration.

whether such determinations are "supported by evidence that a reasonable mind would find adequate." *Dia*, 353 F.3d at 249.

> If the IJ's conclusion is not based on a specific, cogent reason, but, instead, is based on speculation, conjecture, or an otherwise unsupported personal opinion, we will not uphold it because it will not have been supported by such relevant evidence as a reasonable mind would find adequate. In other words, it will not have been supported by substantial evidence.

*Id.* at 250.

## IV. <u>Substantial Evidence – or Lack Thereof</u>

Judge Ferlise condemned, in the harshest of terms, the testimony of Hussain and Shah: it was "totally incredible," "totally implausible," "self-contradictory," "impeached," and, were more needed, it "[did] not make any sense." (App. at 25.) Basing those conclusions on numerous supposed inconsistencies in the testimony, he denied relief. It is clear, however, that the bulk of those inconsistencies – if, indeed, they *were* inconsistencies – were picayune in nature and that his decision was, at bottom, primarily based on one factual finding – his erroneous conclusion that Shah's father was in fact alive at the time of the hearing. There can be no dispute as to the importance that he placed on this conclusion: "[T]he fact that [her] father is indeed alive . . . is a very, very important issue in this case." (App. at 19.)

Judge Ferlise concluded that the father is alive based on one sentence of the testimony given by Hussain and the "highly questionable" death certificates offered by Shah. On direct examination, Hussain testified that Shah's father had been killed, and addressed the circumstances surrounding his death. His testimony as to these facts, although somewhat difficult to follow, was consistent. On cross examination, however, he stated that Shah's father and mother remain in Pakistan today. Judge Ferlise, understandably, sought to resolve the discrepancy

in Hussain's testimony.

> Q. Before you were asked sir, what family members the female respondent has back in Pakistan. You said she has her brothers and sisters, said she had her parents there.
> A. Yes.
> Q. You told me her father is dead.
> A. Later on I said that her father is not active, he's already dead, but her brother is.
> Q. Sir, you're not paying attention. You were asked what family members she presently has in Pakistan. You said her parents, plural, meaning father and mother, and her brothers and sisters. That was not more than five minutes after you told me that her father had been killed. I'd like you to explain that obvious contradiction.
> A. When a girl is married her in-laws are also her parents and her father is dead but I said that her brother is active.
> Q. You said that she had her parents and her brother, sir. Now you're compounding a lie on a lie. I don't appreciate it. I want to know why you said her parents are presently in Pakistan when you told me her father was dead.
> A. I'm not telling a lie. I swear, and I, when I said her parents I meant that her in-laws, mother and father in law, and I already said that her father is dead and her brother is there.
> Q. Well, that's right, you said her father was dead and then you just started talking abut her parents. Why didn't you just say her in-laws. Why did you call them her parents.
> A. This was my mistake.
> Q. Obviously.

(*Id*. at 102-03). In his decision, Judge Ferlise characterized this testimony as an "extraordinary contradiction" which the witness "tried to explain . . . away by saying that when he said her parents are living in Pakistan, he meant her in-laws." (*Id*. at 17.)

11

He stated that he believed the witness "slipped up and . . . divulged to the Court the fact that the respondent's father is indeed alive . . . ."

The only other evidence relied upon by Judge Ferlise to support his conclusion that Shah's father is alive were the death certificates offered by Shah. Although those certificates (along with many other documents) were excluded because they were not certified, Judge Ferlise nevertheless "perused" them, and found them to be "highly questionable." (*Id*. at 18.) He stated:

> The death certificate at tab J has absolutely nothing included in it as to the cause of death of the respondent's father. The Court finds that to be extremely unusual and extremely bizarre. The death certificate at L appears to be defective. It is virtually impossible to read the cause of death and the Court cannot conclude from reading these documents why and how the respondent's father was either killed or died of natural causes.

(*Id*. at 17.) Parenthetically, we note that we do not find it "virtually impossible" to read the cause of death at tab L; indeed, it is rather easy to conclude, with some minimal interpretation, that the father died of cardiac respiratory failure secondary to acute head injury as a result of a firearms injury.

Even if there were no other evidence to corroborate the testimony concerning the father's death, it would be extremely difficult to find that the two considerations relied on by Judge Ferlise constituted substantial evidence in support of his conclusion that the father is alive. With respect to Hussain's "extraordinary contradiction," the witness explained his misstatement. Despite Judge Ferlise's dismissive tone regarding that explanation, the explanation was, in fact, quite reasonable. As for the "questionable" death certificates, we note, as an initial matter, that Judge Ferlise should not have invoked evidence he excluded to undermine Shah's claims. Certainly, he should not have selectively "perused" the excluded documents, relying on the ones that he felt undermined her claim, and ignoring the

12

many other documents that corroborated it. Moreover, his problem with the death certificates related to an inability to understand the *cause of death*. He did not appear to question, on the basis of the death certificates, that Shah's father *was* dead, and certainly the death certificates do not prove that he is alive. Neither consideration, on its own, would be sufficient to support Judge Ferlise's conclusion that Shah's father is alive, and the two together do not "add up to a totality of circumstances that support[]" that conclusion. *Dia*, 353 F.3d at 251. "Rather, they are an aggregation of empty rationales that devolve into an unsupported finding . . . ." *Id.*

When other evidence, which Judge Ferlise ignored, is considered, it is clear that his conclusion is not just difficult to support, it is entirely unsupportable. Pictures of Shah's father lying in a pool of blood on the ground where he was shot appeared in newspaper articles about the murder in two newspapers – *Dawn* (an English-language newspaper) and *Masriq* (an Urdu-language newspaper), articles admitted into evidence. Judge Ferlise utterly failed to address, or even mention, these articles when discussing why he believed the father is alive. One would have expected that, at the very least, he would have explained his rationale for discounting them if, indeed, there was one.

In addition to the newspaper articles, petitioner offered documents corroborating the fact of her father's death, documents which included a First Information Report for the police detailing the circumstances surrounding his death (with translation); an Extract of Entries of Death Registered with Health Department regarding his death (with translation); and a letter to the Deputy Commissioner of Karachi from the Assistant Commissioner regarding his death. Judge Ferlise excluded these documents because they were not authenticated under §287.6.[7] We held in *Liu v. Ashcroft*, 372 F.3d 529 (3d Cir. 2004), albeit

_____

[7] Because the newspaper articles were not official records, they were not excluded with the rest of the documents under § 287.6.

13

after Judge Ferlise ruled on the issue in this case, that § 287.6 "is not an absolute rule of exclusion, and is not the exclusive means of authenticating records before an immigration judge." *Id*. at 533. We made it quite clear that the applicants in *Liu* should have been given an opportunity to prove the authenticity of their documentary evidence through other means. There is no question that here, as in *Liu*, without providing an opportunity to prove authenticity by other means, Judge Ferlise excluded documents that, if authenticated, would have corroborated the testimony of Shah and Hussain. Because the documents may be offered on remand and their authenticity reconsidered, we need not decide what effect they would or should have had on Judge Ferlise's decision had they not been excluded. We note, however, that they surely would not have helped him reach the result he reached.

The strength of the newspaper articles ignored by Judge Ferlise and the weakness of the evidence cited by him compel the conclusion that Shah's father is dead, a fact which now the government concedes. As to this "very, very important" fact, "no reasonable person" would have found Shah and Hussain incredible. *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004); *see* 8 U.S.C. § 1252(b)(4)(B); *Elias-Zacarias*, 502 U.S. at 481 n.1. Stated somewhat differently, this "very, very important" fact is not supported by substantial evidence.

Nor are the handful of other inconsistencies invoked by Judge Ferlise to support his adverse credibility determinations supported by substantial evidence; indeed, virtually all of those "inconsistencies" are either too minor to warrant discussion or are not inconsistencies at all.[8] We make one observation,

_____

[8] We offer but a few examples. Judge Ferlise concluded, as to Hussain, that he changed his testimony as to which agency was responsible for killing Shah's father, and contradicted himself repeatedly about whether Shah was a member of the MQM. He did neither. As for Shah, Judge Ferlise found an inconsistency because she stated in her asylum application that her father was killed because he was a Mojahir and a Shi'a, but

14

however. Aside from the fact that we are at a loss to see the relevance, much less the significance, of any inconsistency between Shah's testimony that her father was murdered when he was visiting a friend, who was a doctor, and newspaper accounts that reflect that her father was a patient of the doctor, not a friend, we find it disturbing that the same newspaper articles that Judge Ferlise failed to consider before concluding that Shah's father is alive were invoked here in an attempt to create an inconsistency for purposes of undermining Shah's credibility.

"Although we don't expect an Immigration Judge to search for ways to sustain an alien's testimony, neither do we expect the judge to search for ways to undermine and belittle it." *Zhang v. Gonzales*, 405 F.3d 150, 158 (3d Cir. 2005). Nor do we expect a judge to selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach. Where, as here, an immigration judge turns his back on these expectations and reaches a conclusion that is not "supported by such relevant evidence as a reasonable mind would find adequate," we will not uphold that conclusion. *See Dia*, 353 F.3d at 250.

We end by noting what we do and do not decide. We find that Shah's father is dead, now an undisputed fact and one that

---

later claimed it was because of his involvement with the MQM. But there is no inconsistency because the MQM is a political group that represents Shi'a Mohajirs. Judge Ferlise also made findings having no support in the record and ignored evidence in the record when it suited his purposes to do so. With reference to the former, it was sheer speculation to conclude that it was "probable" that "if indeed any harm came to [Shah] or her family it had to do with a rival organization meting out their own form of justice." (App. at 21-22.) With reference to the latter, the State Department Country Report supposedly contained "nothing" indicating that the police target and kill MQM members or that the government sponsors violence against MQM members. Judge Ferlise was wrong.

was virtually undisputable before now.  That fact was the foundation on which the applications for relief were built, and Judge Ferlise recognized its critical importance.  We leave the effect of that erroneous finding to the BIA on remand and leave to it, as well, the question of whether petitioners, with the father's death and the witnesses' credibility established, have satisfied the requisites for the relief they seek.

We will grant the petition for review, vacate the order of the BIA and remand to the BIA for further proceedings consistent with this opinion.  We urge that, on remand, a different immigration judge be assigned to any further proceedings.  *See Sukwanputra v. Gonzales*, 434 F.3d at 627, 638 (3d Cir. 2006) (quoting *Korytnyuk v. Ashcroft*, 396 F.3d 272, 287 n.20 (3d Cir. 2005) ("[W]hile we recognize that assignment of an [IJ] is within the province of the Attorney General, if on remand an IJ's services are needed, we believe the parties would be far better served by the assignment to those proceedings of a different IJ.") (alternation in original, internal quotation marks and citations omitted).