# In the
# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 06-1346 & 06-1511

ADVOCATE SOUTH
SUBURBAN HOSPITAL,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR
RELATIONS BOARD,

*Respondent/Cross-Petitioner,*

SERVICE EMPLOYEES
INTERNATIONAL UNION,

*Intervening Respondent.*

---

On Petition for Review of and Cross-Petition
for Enforcement of an Order of the
National Labor Relations Board
No. 13-CA-42246

---

ARGUED SEPTEMBER 8, 2006—DECIDED NOVEMBER 21, 2006

---

Before CUDAHY, EASTERBROOK, and MANION, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Advocate South Suburban Hospital was charged with unlawfully threatening one of its nurses for her participation in the Service Employees International Union's campaign to organize Advocate

employees. The National Labor Relations Board concluded that one of Advocate's managers coercively interrogated and threatened the nurse and implied that the union was under surveillance, all in violation of National Labor Relations Act § 8(a)(1), 29 U.S.C. § 158(a)(1). However, the Board dismissed another, similar charge against a security guard. It ordered Advocate to cease and desist from interfering with its employees' rights and to post a notice informing the employees of their rights. Advocate now petitions for review of the NLRB's decision, while the NLRB cross-petitions for enforcement of its order. The union intervenes in support of the NLRB. We deny Advocate's petition for review and grant the NLRB's cross-petition for enforcement.

## I. Background

Advocate South Suburban Hospital (Advocate) employs about 1,350 people at its facilities in Hazel Crest, Illinois. In the summer of 2004, Service Employees International Union (SEIU) was campaigning to unionize some of them. One employee receptive to SEIU's campaign was Susan Hall, a Certified Nurse Assistant still employed at Advocate at the time of her testimony. In 2004 she had worked the graveyard shift and an occasional night shift at Advocate for six and a half years. Hall claims that when Advocate discovered her attendance at SEIU meetings and she appeared in SEIU literature she was threatened by her supervisor Beverly Mulvihill, Advocate's Manager of Surgical Services. Hall also claims that a security guard warned her not to pass out SEIU literature to other employees. Advocate and its witnesses claim that neither of the alleged events occurred.

In a hearing before an Administrative Law Judge (ALJ), Hall testified that two SEIU representatives, identified only as C.J. Grimes and Julie, visited her house some time in the summer of 2004. (The precise date is unknown; Hall could

roughly describe when events occurred in relation to each other but was mostly unable to give precise dates.) After they discussed conditions at the hospital, the organizers invited Hall to an SEIU meeting. Hall attended two such meetings at the Tinley Park Convention Center, the first about a week and a half to two weeks after Grimes and Julie visited Hall's house, the second about a week and a half after the first meeting. During the second meeting the SEIU photographed her. Hall's only other union-related activity prior to "late July, early August 2004" was a discussion at the hospital with three co-workers about how the union had acquired their names, addresses and telephone numbers. (Hearing Tr. at 135.)

Hall's flirtation with the SEIU allegedly drew a threat from Advocate. She testified that on a day between late July and August 12, 2004,[1] she was working a double shift (night and graveyard). At 3:30 or 4:00 p.m., Mulvihill caught Hall in the hallway and said she needed to talk to Hall. (*Id.* at 136-37.) Thinking that she was being disciplined for some infraction, Hall followed Mulvihill into Mulvihill's office, where Kathy Mrozek, Advocate's Director of Nursing, was already present. (*Id.* at 137-38, 251.) Mulvihill told Hall to close the door, and she did. (*Id.* at 153, 230.) Mulvihill then told Hall that she had been hearing people talk about the union. Hall responded that everybody was talking about it. Mulvihill added that she had specifically heard that Hall

---

[1] Again, Hall did not precisely date her confrontation with Mulvihill, but identified a broad stretch of time in which it could have occurred: the "late July, early August 2004 time period" (Hearing Tr. at 136); "end of July, first two weeks of August, somewhere around there" (*id.*). She also testified, however, that the confrontation occurred before she received a disciplinary write-up for absenteeism on August 12 (*id.* at 141-42), and she once ventured that the write-up occurred "maybe a week after" the confrontation (*id.* at 156).

had been talking. (*Id.* at 137, 154.) Hall said she didn't want to discuss it. Mulvihill then said sternly that "we make examples" of people who talk about the union, and that "[t]here will be a sacrificial lamb." (*Id.*) Nonplused, Hill told Mulvihill to "do whatever" and left the office. (*Id.*) According to Hall, Mrozek was silent throughout the conversation. (*Id.* at 139-40.) Hall felt that her job had been threatened and telephoned C.J. Grimes to tell her what had happened. (*Id.* at 155.)

Advocate contends that Hall's story is a complete fabrication. Mulvihill testified that she never made any of the comments that Hall attributed to her at any time. Mrozek testified that she had not been in Mulvihill's office with Hall "on or about August 9," that Mulvihill had never asked her to watch Mulvihill discipline an employee and that she had never heard another supervisor tell Hall that Advocate would make a "sacrificial lamb" out of anyone. (*Id.* at 382-83.) Advocate also attempted to impeach Hall with statements about the confrontation she had made in SEIU videos and speeches, and with quotes from SEIU pamphlets. While Hall's story has the same backbone in the union materials as in her testimony, the sources arguably vary with respect to where the confrontation occurred and whether Mrozek was present.

Reviewing the evidence, the ALJ concluded that Mulvihill had interrogated and threatened Hall and implied that the SEIU was under surveillance, meaning that Advocate had interfered with Hall's right to assist labor organizations in violation of National Labor Relations Act § 8(a)(1) (NLRA), 29 U.S.C. § 158(a)(1). The ALJ found Hall's testimony credible, stating that she appeared sure of her recollection, gave spontaneous answers and held to her story under "withering cross-examination." (ALJ Op. at 4.) Further, she had little reason to falsely testify against Advocate in light of her continued employment there, and there was "no

evidence that Hall was hostile to management or biased as a result of having been disciplined." (*Id.*)

Although Hall had made prior inconsistent statements and "had the tendency to exaggerate or embellish her statements in minor respects," these did not shake the ALJ's belief in the essential elements of her story. (*Id.* at 5.) Hall testified that the SEIU composed the brochures and scripted her videos and speeches. To the extent that the inconsistencies could be attributed to her, they were minor. Her prior statements still generally supported her testimony, and where they differed from it the ALJ found her testimony the more believable account.

Mulvihill's testimony, by contrast, sounded "mechanical" and "rehearsed" to the ALJ, and she appeared "evasive" and "defensive" when asked questions by opposing counsel. (*Id.* at 5.) Further, her management position and her critical description of union tactics that she seemed to feel improperly harassed employees[2] led the ALJ to conclude that she was biased in favor of Advocate.

Mrozek, the ALJ found, was also biased as an Advocate manager and as Mulvihill's personal friend. Further, she had answered limited questions and had not clearly denied the key elements of Hall's story. Her testimony that she had not witnessed any discipline, had not heard the term

---

[2] When asked whether employees had told her they had been visited at their homes, she replied, "I have had employees tell me that. That union representatives came to their door, banged on their door, wouldn't go away. Stuck their foot in their door. But as to who and when, I don't know." (Hearing Tr. at 332.) When asked what was talked about in employee conversations about the union that she overheard, she answered, "Home visits, the fact that the union was pounding on people's car windows when they were trying to get into work, trying to give them information." (*Id.* at 357.)

"sacrificial lamb" and had not seen Hall in Mulvihill's office on or about August 9 left open the possibility that there had been a confrontation (not involving the dramatic "sacrificial lamb" comment) at some time before August 9.

Hall also testified that an Advocate security guard threatened her the week of October 13, 2004. After briefly talking to C.J. Grimes and another union organizer in the street outside the hospital, Hall parked in the hospital lot. A security guard approached and asked her if she knew "those people." He told her that if she talked to them on hospital property she could be arrested, and that if she passed out any of their stuff on hospital property she would be "walked off the premises." (Hearing Tr. at 146-48.) Although Hall described the security guard, she did not know who he was and had not tried to identify him except by asking another guard if he knew a co-worker matching her description. Apparently he did, one "Roger" who was no longer employed by Advocate at the time of the hearing.

The ALJ did not find a violation with respect to the security guard incident. Although he believed that the "general scenario" could have occurred, Hall's tendency to exaggerate and embellish made him worry that the guard's alleged threats may have been innocent. Hall had no right to distribute union literature on company time and in patient care areas, so "slight variation[s]" in what the guard told her could make the difference between a proper instruction and a prohibited threat. Additionally, he thought it unfair to Advocate that Hall had not identified the guard and that he now, apparently having left Advocate's employ, could not be located to testify. (*Id.* at 7.)

The ALJ ordered Advocate to cease and desist from interrogating and threatening employees and suggesting that union activities are under surveillance. It also required posted notice informing employees of their rights. Advocate appealed the ALJ's decision to the National Labor Relations

Board (the NLRB or the Board). The NLRB adopted and affirmed the ALJ's decision subject to one minor modification.[3] *In re Advocate South Suburban Hospital,* 346 NLRB No. 23, 2006 WL 92791 (Jan. 10, 2006). The parties now take the fight to this court. Advocate petitions for review of the NLRB's decision on many grounds; the NLRB, with the intervenor SEIU, petitions to have it enforced.

## II. Discussion

This is not a difficult case. We do not draw our own conclusions as to what witnesses are most convincing, or hazard a guess as to what may have happened at Advocate in the summer of 2004. As an appellate court, our task is to determine whether the NLRB's legal conclusions have a reasonable basis in law, *Slusher v. NLRB*, 432 F.3d 715, 725 (7th Cir. 2005), whether its factual conclusions are supported by "substantial evidence," NLRA § 10(e)-(f), 29 U.S.C. § 160 (e)-(f), and whether the two together "build an accurate and logical bridge between the evidence and the result," *J.C. Penney Co. v. NLRB*, 123 F.3d 988, 995 (7th Cir. 1997), quoting *Sarchet v. Charter,* 78 F.3d 305, 307 (7th Cir. 1996). This review is deferential. "Substantial evidence" means evidence that a reasonable mind could accept as adequate to support the NLRB's conclusions; if the record could reasonably be interpreted to support the

---

[3] The NLRB rejected one of the bases of the ALJ's decision, that a present employee's testimony is not only likely to be credible as a statement against pecuniary interest but is further *presumed* to be credible. *Advocate South*, 2006 WL 92791, at *1 n.1. Advocate urges that upon disagreeing with the ALJ's rationale the NLRB had to remand the case, but the NLRB is entitled to make its own factual findings, independent of and potentially contrary to the ALJ's, and it is the NLRB's decision that we review. *Slusher v. NLRB*, 432 F.3d 715, 727 (7th Cir. 2005).

NLRB, that is the end of our inquiry. *Slusher*, 432 F.3d at 726.

Advocate acknowledges our limited role; yet it scours the record for *anything* that could lead a factfinder to discredit Hall and believe its own witnesses, insisting that the NLRB failed to properly "discuss the inferences which could be drawn" from the evidence. (Pet'r Br. at 25.) This may reflect not only the laudable zeal of Advocate's advocates, but also a misunderstanding of the NLRB's duty to explain its decision. At times, Advocate seems to believe that reversal is automatic if it can dig up an argument for its position of whatever strength that the NLRB failed to explicitly address in Advocate's chosen terms. For instance, Advocate states that the NLRB's "failure to consider *or even to reference*" one of its weaker arguments "requires the petition for review to be granted." (*Id.* at 22 (emphasis added).)

Section 10(e) of the NLRA does not require an impossible level of detail from the NLRB. True, failure to address important evidence can sometimes cause a decision's "logical bridge" to collapse. *See, e.g., Young v. Barnhart*, 362 F.3d 995, 1002-03 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 594-96 (7th Cir. 2002); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). But the duty to bridge the gap between evidence and result does not require a "complete written evaluation of every piece of testimony and evidence." *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), *quoting Diaz v. Charter*, 55 F.3d 300, 308 (7th Cir. 1995). In assessing the adequacy of the Board's explanation, we must use common sense to determine whether requiring additional explanation of a point would be appropriate or mere nitpicking. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

With that in mind, we proceed to Advocate's various arguments against the NLRB's decision. Its claims can be

grouped into three categories: those relating to witness credibility, those relating to the NLRB general counsel's failure to present certain testimony at the hearing and those alleging logical inconsistency in the NLRB's decision.

### A.  Witness Credibility

This case is basically a swearing contest: in the union's corner, Susan Hall; in Advocate's, the tag team of Beverly Mulvihill and Kathy Mrozek. The NLRB adjudged Hall the victor by decision, and Advocate protests the referee's scorekeeping. Advocate insists that the NLRB's findings are based in part on factors other than witness demeanor and are consequently not "credibility determinations" entitled to special deference beyond ordinary substantial evidence review. *See Multi-Ad Services, Inc. v. NLRB*, 255 F.3d 363, 370-71 (7th Cir. 2001); *Kopack v. NLRB*, 668 F.2d 946, 953-54 (7th Cir. 1982). We do not address that contention because Advocate's substantive arguments do not require us to do so. The NLRB's findings are supported by substantial evidence.

### 1.  Susan Hall

Advocate attacks the NLRB's decision to credit Hall's testimony on two grounds: first, that she was impeached by several prior inconsistent statements; second, that she was biased.

### a.  Prior Inconsistent Statements

Advocate repeatedly contrasted Hall's hearing testimony with arguably inconsistent accounts of her story in SEIU promotional literature. It appears that Mulvihill's alleged threats became something of a *cause celebre* for SEIU's campaign at Advocate, and Hall's story was recounted in

various media. For instance, Advocate entered into evidence an SEIU pamphlet entitled *Faith in Action*. The pamphlet contains tales of several Advocate employees meant to illustrate problems at the company and the need for a union. Hall's story, including an account of her confrontation with Mulvihill written in the third person, appears in the pamphlet along with her photograph. (Resp't Ex. 6 at 10.) Additionally, Hall told her story in videos such as *Untie My Hands* and *Separate and Unequal*, transcripts of which Advocate introduced into evidence (Resp't Ex. 9, 10), and in a speech at Bethany Church, a script from which Advocate introduced into evidence (Resp't Ex. 11).

Advocate argues that a reasonable factfinder could not believe Hall because the story in some of the union materials differs from her hearing testimony. It focuses on two alleged discrepancies. First, Hall at times indicated that Mulvihill had confronted her in a hospital hallway, without mentioning Mulvihill's office;[4] second, many accounts omitted Mrozek's presence at the confrontation, with Hall describing the confrontation as "one-on-one" in her Bethany Church speech.[5] These are flimsy weapons with which to

---

[4] From *Faith In Action*: "During the summer of 2004, Susan decided to talk to her coworkers about making improvements through forming a union. Soon after, she was pulled aside by her supervisor in the hallway at work. The supervisor said, 'I've been hearing rumors that there's talk about a union.'" (Resp't Ex. 6 at 10.) From the Bethany Church speech: "My supervisor pulled me aside in the hall at work and tried talking me out of forming our union. When I made it clear to her that I didn't want to talk to her about this, she got very angry. She threatened me." (Resp't Ex. 11 at 2.)

[5] From the Bethany Church speech: "I am scared to stand here and tell my story, but I am determined to fight for a union to improve our hospitals. When my manager found out I was for the

(continued...)

attack the NLRB's findings. Indeed, the statements arguably do not contradict Hall's testimony. The speech and pamphlet indicate that Mulvihill "pulled [Hall] aside in the hall at work" and spoke to her (Resp't Ex. 6 at 10; Resp't Ex. 11 at 2), but as the NLRB observes, this meshes with Hall's testimony that she and Mulvihill moved to Mulvihill's office after meeting in the hallway. Hall's statement in her Bethany Church speech that Mulvihill "pulled me away from my patients to interrogate me one-on-one" is also ambiguous. (Resp't Ex. 11 at 3). She might have meant "one-on-one" only to indicate that Mrozek did not actively participate in the interrogation.

At any rate, these questions are not critical, and neither is whether Hall controlled the contents of her speech and the brochures, both of which were composed largely by the union.[6] Depending upon the situation, substantial evidence may support a factfinder's belief in a witness despite prior inconsistent statements. *See, e.g.*, *NLRB v. Chem Fab Corp.*, 691 F.2d 1252, 1258-59 (8th Cir. 1982) (affirming the

---

[5] (...continued)
union, and she pulled me away from my patients to interrogate me one-on-one about the union [sic]." (Resp't Ex. 11 at 3.) The beginning of the second sentence originally read "My manager," but the word "My" has been struck out and the words "When my" handwritten above it.

[6] The parties argue at length whether the pamphlet statements, clearly composed largely by the SEIU, and Hall's speeches can be attributed to Hall. Hall testified that the pamphlet and her speaking scripts were composed by the union (*see, e.g.,* Hearing Tr. at 183-84), but Advocate points to handwritten alterations on Hall's Bethany Church script that it suggests indicate she maintained some editorial control (*see, e.g.,* Resp't Ex. 11). We do not need to address what degree of control Hall had; we assume for purposes of the appeal that the statements are attributable to her.

decision to credit a witness's testimony regarding a manager's order to remove a union sweatshirt where the witness had previously affirmed that the manager said nothing about the shirt). The circumstances and relevance of the contradiction are critical. Where a contradiction goes to the heart of a witness's story, belief can be error. *See Capric v. Ashcroft*, 355 F.3d 1075, 1089-90 (7th Cir. 2004); *NLRB v. Local 46, Metallic Lathers Union*, 149 F.3d 93, 106 (2d Cir. 1998). But crediting the witness makes sense where the impeaching statements differ only with respect to minor aspects of the story or where the discrepancies are easily explained. *Giday v. Gonzales*, 434 F.3d 543, 551 (7th Cir. 2006), *Shah v. U.S. Attorney Gen.*, 446 F.3d 429, 434-36 (3d Cir. 2006).

In the present case the differences between the union promotional material and Hall's testimony are minor and explicable. The NLRB adopted the ALJ's finding that any contradictions were unimportant; the union material "generally supported [Hall's] testimony and appeared consistent with her sworn account of the conversation." *In re Advocate South Suburban Hospital,* 346 NLRB No. 23, 2006 WL 92791, at *5 (Jan. 10, 2006). Moreover, the minor omissions were explicable in a persuasive pamphlet or speech composed with "some literary license." *Id.* While invention would be less understandable, omitting details of Hall's story in a persuasive context would help make her story more concise and forceful. Hall's testimony supported the NLRB's take on the union material. For instance, she said that the pamphlets were "advertisement." "And what I mean by advertisement is, is that they have taken things that other people have said or that was quoted as Union meetings [sic] and they just kind of threw it together." (Hearing Tr. at 184.) Later, when asked why she made statements that she thought contained inaccuracies, she responded that she was "trying to make a point" and that the SEIU "said it would be good because it would show the

type of coercion that you all are subjected to," again empha- sizing that the union literature was not designed to recount Hall's story in full but to convincingly illustrate purported problems at Advocate. (*Id.* at 254-55.) Given the omissions' limited relevance to the core of Hall's story and her expla- nation for them, it was reasonable for the NLRB to credit her testimony.

### b. Bias

Advocate also argues that the NLRB could not believe Hall because she was biased against Advocate. The NLRB found that she was not biased in light of her continuing employment with the hospital at the time of the hearing, which gave her reason to testify in its favor and avoid the ire of her superiors. *Advocate South*, 2006 WL 92791, at *1 n.1, *citing In re Flexsteel Industries,* 316 NLRB 745, 745 (1995) (holding that the testimony of current employees contradicting their managers is adverse to the employees' pecuniary interests and particularly reliable). Advocate argues that every employee who complains about mistreat- ment at work is necessarily biased. We do not agree. The case Advocate cites in support concludes only that a particular former employee was disgruntled because of a past dispute with a company, not that all dissatisfied employees are untrustworthy. *See T&J Meat Packing, Inc. v. Serv. Employees Int'l Union, Local 1*, No. 04-C-1475, 2005 WL 623227, at *8 (N.D. Ill. Mar. 16, 2005). While the ALJ's statement that there was "no evidence" of bias was perhaps an overstatement, it was reasonable to find any such evidence of bias outweighed by Hall's current employment.

### 2. Beverly Mulvihill

As Advocate seeks to discredit the NLRB's witness, so it seeks to bolster its own, arguing that the NLRB's finding

that Mulvihill was biased is unsupported by the record. It *is* supported, despite Advocate's flurry of objections. When asked what she had heard employees saying about the union, Mulvihill repeatedly described the SEIU's tactics in harsh terms, saying for example that they "wouldn't go away," "[s]tuck their foot in [employees'] door[s]" (Hearing Tr. at 332) and "pound[ed] on people's car windows when they were trying to get into work, trying to give them information" (*id.* at 357). Advocate argues that Mulvihill was only repeating others' words, but that is not clear in the record. Advocate also urges that Mulvihill's statement at an employee meeting that she did not have an opinion with regard to unionization proves her neutrality. It proves that she is not both biased and foolish, but it leaves the possibility that she is wise enough to display bias only behind a closed door. Neither do Mulvihill's relatives who are union members prove her friendly with the SEIU in particular. Finally, Advocate says that there was no evidence that Mulvihill adopted anti-union sentiments expressed at managerial training sessions, forgetting, of course, Hill's testimony that Mulvihill threatened her with vague doom for talking about the SEIU.

Even assuming that Mulvihill isn't biased, the NLRB still adopted the ALJ's finding that Mulvihill seemed "mechanical" and "rehearsed," as well as "hesitant" and "evasive" when asked questions by opposing counsel. *Advocate South*, 2006 WL 92791, at *3. Such demeanor evidence alone can, in the present circumstances, support a conclusion that Mulvihill lied.

### 3. Kathy Mrozek

The NLRB disbelieved Mrozek, adopting the ALJ's conclusion that she was biased by her friendship with Mulvihill, and thought she had given very narrow testimony that did not fully contradict Hall's account. Both conclusions were supported by substantial evidence.

Advocate urges that friendship alone can never support a finding of bias, citing a case that instead holds that a factfinder is not *compelled* to disbelieve a friend's testimony. *Hampton v. Leibach*, 347 F.3d 219, 254 (7th Cir. 2003) (holding that an attorney's failure to present the exculpatory testimony of a criminal defendant's friends prejudiced the defendant). Friendship is evidence for a factfinder to consider, *id.*, and it supported the NLRB's conclusion here.

Assuming Mrozek's testimony were true, the NLRB additionally concluded that Mrozek had not contradicted Hall's account. Mrozek testified that she had not been in Mulvihill's office with Hall "on or about August 9, 2004" (Hearing Tr. at 382), that Mulvihill had never invited her to witness Mulvihill discipline an employee and that she had never heard anyone tell Hall that Advocate would make a "sacrificial lamb" out of an employee (*id.* at 383). The possibility remains that Mrozek had witnessed a confrontation before August 9 in which Mulvihill had not used the term "sacrificial lamb." Advocate notes that in legal parlance the phrase "on or about" indicates a reasonable period of time around the named date, and argues that Mrozek's testimony must be taken to indicate the full period in which Hall said the encounter could have occurred. *See, e.g., Lewis v. Merrill*, 228 Or. 541, 543, 365 P.2d 1052, 1053 (1961). But Mrozek, who so far as the record reveals has no legal expertise, might have understood the attorney's question differently, especially in light of Advocate's unsuccessful effort to prove that the alleged confrontation could have occurred only on August 9.[7] The SEIU's brief cross-examina-

---

[7] Advocate introduced records indicating that Hall was not working the night shift, when she says the confrontation occurred, on August 10 through 12. (Hearing Tr. at 306-13.) It argued that this proved the confrontation could have occurred only on August

(continued...)

tion suggested a narrow understanding of her answer by revealing that Mrozek had been in Mulvihill's office earlier in the summer. (*Id.* at 386). In these circumstances, the NLRB's understanding of Mrozek's testimony was supported by substantial evidence.

Advocate also argues, without citation, that the ALJ's failure to further question Mrozek to determine what she understood "on or about" August 9 to mean demonstrated bias requiring reversal. The Constitution requires unbiased adjudicators in quasi-judicial administrative proceedings, but ALJs are presumed fair absent contrary evidence of deep-seated favoritism. *See Liteky v. United States*, 510 U.S. 540, 555 (1994); *Schweiler v. McClure*, 456 U.S. 188, 195 (1982). In the present case, the ALJ's failure to pin down Mrozek can be easily explained without the farfetched theory that he was determined to build a record to support judgment for the NLRB. He might simply have missed the problem at first. Besides, in an adversary legal system it is generally the attorney's duty to provide specific testimony. Advocate cannot palm off on the ALJ its apparent failure to properly question Mrozek.

B. Adverse Inference from C.J. Grimes's Failure to Testify

Advocate attacks not only the inferences the NLRB drew from testimony the ALJ heard, but one it drew from testimony the ALJ didn't hear, or rather that it drew from

---

[7] (...continued)

9. But even taking Hall's narrowest characterization of the time in which the confrontation could have occurred, about a week before she was disciplined on August 12 (*id.* at 156), that still leaves several unexamined days around August 5. The ALJ recognized as much. (*Id.* at 312 ("We would need the time cards then for July and August.").)

the NLRB General Counsel's failure to present it. The General Counsel flirted with calling the SEIU organizer, C.J. Grimes, to the stand, presumably to corroborate Hall's testimony and rebut Advocate's fabrication defense. Hall testified that she telephoned Grimes shortly after her confrontation with Mulvihill; if that is true, Grimes could confirm the conversation and its contents. But the General Counsel chose not to call Grimes. Advocate urges that this must be because Grimes *wouldn't* have corroborated Hall, but would have instead critically contradicted her, or otherwise made some damning admission. What form the contradiction or admission would have taken is, of course, speculative. Below, Advocate urged that Grimes would have testified that Hall's original story was the one told in the union materials, aiding its impeachment efforts. (Resp't Exceptions to the Administrative Law Judge's Decision ¶ 55, 60; Resp't Reply to Charging Party and General Counsel's Answer to Resp't Exceptions and Br. in Supp. at 8-9.) Advocate now suggests that Grimes would have revealed that the chronology of Hall's account was confused and impossible; specifically, she would have indicated that the second union meeting, which Hall said occurred before the confrontation, occurred after August 12, which Hall instead said postdated the confrontation. (Pet'r Br. at 21.) Advocate argues that the NLRB should have inferred that Grimes would have testified to such an effect and taken that inference into account in reaching its decision, an application of the so-called "missing witness" rule. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 225-26 (1939); *Roper Corp. v. NLRB*, 712 F.2d 306, 310 (7th Cir. 1983), *Wigmore on Evidence* § 285 (1979).

The argument collapses when one considers that Advocate had the power to compel testimony. If Grimes would have done so much damage, why didn't Advocate put her on the stand? The inference Advocate urges against the General Counsel can be turned back at itself, which is why we have

previously held that a party can take advantage of the "missing witness" rule only when "the missing witness was peculiarly in the power of the other party to produce." *J.C. Penney Co. v. NLRB*, 123 F.3d 988, 996 n.2 (7th Cir. 1997), *quoting Oxman v. WLS-TV*, 12 F.3d 652, 661 (7th Cir. 1993); *see also Wigmore* § 288.[8] Both parties agree that Advocate could have subpoenaed Grimes. 29 U.S.C. § 161(1). Advocate does not argue that it was somehow unaware of the potential relevance of Grimes's testimony or otherwise unable to bring her to the stand. Under these circumstances, the NLRB's failure to draw an inference in favor of Advocate was entirely reasonable.

Even if an adverse inference were called for, its strength would not be such as to compel a reasonable factfinder to disbelieve Hall because the NLRB General counsel did not have a very strong incentive to present Grimes's testimony,

---

[8] Since our own precedent establishes this rule we must respect it, regardless of some NLRB adjudications to the contrary. *See, e.g.*, *In re Int'l Automated Machines, Inc.*, 285 NLRB 1122, 1122-23 (1987) (holding that the rule can apply even when the missing witness "was equally available to be called by both" parties). But even if we were not bound to do so, we would still reject the NLRB's version of the rule because it is irrational. The missing witness rule is not a "counterfactual evidentiary presumtio[n]" designed to further "particular legal or policy goals." *See Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 378 (1998). It is not even special to the labor law context. It is a general, common sense attempt to codify the inference one can draw from a party's failure to call a witness. *See BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1098 (7th Cir. 1994); *Wigmore* § 285. Consequently, the NLRB is not free to arbitrarily declare that it will accept the plausible inference against the NLRB's general counsel but not the equally plausible and counterbalancing inference against Advocate; it must "draw all those inferences that the evidence fairly demands." *Slusher*, 432 F.3d at 726, *citing Allentown Mack*, 522 U.S. at 378.

which was essentially cumulative and of little value. *United States v. Gant*, 396 F.3d 906, 910 (7th Cir. 2005); *Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1150-51 (10th Cir. 1990). Grimes is not a third party whose disinterested confirmation of Hall's tale could have blown the case wide open. She is an organizer for SEIU; if anything, she had more reason to falsely corroborate Hall's story than Hall had to fabricate it. The NLRB did not have to conclude that some dark secret kept her off the stand. The general counsel may have simply wanted to save time. The NLRB's decision to credit Hall despite the absence of testimony from Grimes was reasonable and supported by substantial evidence.

### C. Alleged Inconsistencies

Finally, Advocate urges that the NLRB's decision has to be reversed because of two alleged inconsistencies in its opinion. Neither inconsistency is real.

#### 1. Discredited Security Guard Story

Advocate argues that it was unreasonable for the NLRB to discredit Hall's story about the encounter with the security guard on the grounds that she had a tendency to "exaggerate or embellish her statements in minor respects" and yet to credit her Mulvihill story, presumably affected by the same tendency. This interpretation, however, oversimplifies the Board's position; in fact, the NLRB adopted the ALJ's finding that the "general scenario [involving the guard] as described by Hall may have occurred," but that due to Hall's tendency to embellish her testimony, it could not be sufficiently certain that what the security guard actually said to Hall violated the NLRA. *In re Advocate South Suburban Hospital,* 346 NLRB No. 23, 2006 WL 92791, at *7 (Jan. 10, 2006).

Thus, the NLRB ruled that the security guard did have the right to "threaten" Hall for distributing literature in certain ways: Hall had no right to distribute literature in patient care areas or while she was on the clock. In the case of the security guard testimony, therefore, a relatively slight distortion in the telling could turn a report of a legitimate warning (informing Hall that she could be disciplined for distributing literature on the clock) into an account of an improper threat (telling Hall that she could be fired for distributing literature to coworkers at any time). *Id.* at *7.

The NLRB was not as concerned with Hall's "embellishment" tendency when evaluating the story of her confrontation with Mulvihill because it was completely impermissible for Mulvihill *in any way* to imply that the union was under surveillance or to threaten Hall for or coercively interrogate her about her union activities. Even if the NLRB concluded that Hall had significantly amplified the degree of threat in her testimony, the underlying events would still be illegal. The NLRB's decision to treat Hall's similar allegations against the two employer representatives differently was understandable.

### 2. "Known Union Organizer" Finding

Advocate claims that the NLRB's characterization of Hall as not a "known union organizer" was inconsistent with its decision to believe Hall's account of Mulvihill's implied charge that Hall was working with the union. *Id.* at *6. But the Board, in speaking of a "known union organizer," did not mean to say that *no one* knew Hall was working with the union, merely that her activities were not general knowledge. That such knowledge was limited to a few interested parties was the basis of the Board's conclusion that Mulvihill's telling questions about Hall's relationship to the union implied that the SEIU was under surveillance.

*Id.* The NLRB's conclusion was internally consistent and reasonable.

### III.  Conclusion

For the foregoing reasons, we conclude that the ALJ's findings and decision, as adopted and modified by the NLRB, are supported by substantial evidence. Advocate's petition for review is DENIED. The NLRB's petition for enforcement of its order is GRANTED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*